**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TALKSPACE, INC. SECURITIES LITIGATION | Civil Action No. 1:22-cv-00163-PGG<br><br>CLASS ACTION<br><br><br>JURY TRIAL DEMANDED |

**CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................... 1

II.     JURISDICTION AND VENUE ...................................................................... 7

III.    PARTIES .......................................................................................................... 8

    A.    Plaintiffs.......................................................................................................... 8

    B.    Defendants .................................................................................................... 10

        1.   Defendant Talkspace .......................................................................... 10

        2.   Management Defendants ..................................................................... 10

        3.   Proxy Defendants ............................................................................... 11

        4.   Blank Check Sponsor Defendants ...................................................... 12

    C.    Non-Party Jennifer Fulk ............................................................................. 13

IV.     SUBSTANTIVE ALLEGATIONS ............................................................... 13

    A.    Background .................................................................................................... 13

    B.    The Merger and Talkspace as a Public Company........................................ 20

        1.   SPACs In General................................................................................ 20

        2.   The Groop/HEIC Merger .................................................................... 24

V.      DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS IN
        VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT ................... 37

    A.    Misstatements and Omissions Concerning Conversion and Matching Algorithm........ 37

    B.    Misstatements and Omissions Regarding Scalability and Automated Claims
Processing .................................................................................................... 39

    C.    Misstatements and Omissions Regarding B2B Eligible Lives ..................... 41

    D.    Misstatements and Omissions Regarding the Strength of Talkspace's Management ... 41

    E.    Misstatements and Omissions Regarding Internal Controls......................... 42

VI.     ADDITIONAL SCIENTER ALLEGATIONS............................................... 47

VII.    DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS IN
        VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT ................... 49

VIII.   LOSS CAUSATION........................................................................................ 64

IX.     PRESUMPTION OF RELIANCE ................................................................. 67

X.      NO SAFE HARBOR ...................................................................................... 69

XII.    FRAUD CLAIMS ........................................................................................... 71

    COUNT I ................................................................................................................ 71

    COUNT II ............................................................................................................... 73

XIII.   PROXY CLAIMS ................................................................................................. 74

    COUNT III ........................................................................................................... 77

    COUNT IV ........................................................................................................... 79

XIV.   PRAYER FOR RELIEF ...................................................................................... 81

XV.   JURY DEMAND ................................................................................................. 81

Court-appointed Co-Lead Plaintiffs Steven Jacob Greenblatt, Montague Street LP, Greenblatt Family Investments LLC, William Greenblatt, Judith Greenblatt, the Brandon T. Greenblatt 2015 Trust, the Maggie S. Greenblatt 2015 Trust, the Steven Jacob Greenblatt 2015 Trust (the "Montague Street Group"), and Ivan M. Baron ("Baron," and with the Montague Street Group, "Co-Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon information and belief as to the investigation conducted by Plaintiffs' counsel, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings of Talkspace, Inc. ("Talkspace" or the "Company") f/k/a Hudson Executive Investment Corporation ("HEIC"), securities analyst reports, press releases, and other public statements issued by, or about, the Company.[1]

Many of the facts supporting the allegations contained herein are known only to Defendants (defined below) or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this class action for violations of: (i) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities that purchased or otherwise acquired Talkspace securities between June 11, 2020 and November 15, 2021, both dates inclusive (the "Class Period"); and (ii) Sections 14(a) and 20(a) of the Exchange Act on behalf of all holders of Talkspace common stock as of the May 19, 2021 record date (the "Record Date") for the special meeting of shareholders held on June 17, 2021 and who were entitled to vote on the approval of the merger between HEIC and Talkspace (the "Merger"), based on the proxy statement issued in connection with the Merger (the "Proxy").

2.    This action arises from the intentional abuse by Defendants of the corporate form

known as a special purpose acquisition company ("SPAC") to mislead public investors, including Plaintiffs, and perpetrate Defendants' fraud. A SPAC is a blank-check company that does not initially have any operations or business of its own but conducts an initial public offering and then merges with an operating company that becomes publicly traded. HEIC was such a company, "formed in order to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or other similar business combination with one or more businesses or entities." The operating company usually does not publicly report financial or operating results, so investors must rely on the SPAC's sponsor to be transparent about the private company it is acquiring and to be diligent in spending the offering proceeds to acquire a target company that will offer attractive risk-adjusted returns to investors.

3.      The SEC and market commentators have warned that company insiders and promoters can use SPACs to defraud public investors while enriching themselves. Indeed, to protect public investors, on March 30, 2022, the SEC issued proposed rules to regulate SPACs to deter abuses and fraud.

4.      Defendants' conduct, as alleged herein, is an example of the abusive SPAC conduct the SEC is seeking to deter. Defendants deceived public investors, including Plaintiffs, while benefiting themselves.

5.      Specifically, sponsor HEC Sponsor LLC (launched and created by Hudson Executive Capital LP) created HEIC, a SPAC. HEIC became a public company in June 2020 and sought to merge with a private company.

6.      On January 13, 2021, HEIC issued a press release announcing that it had entered into a merger agreement with Groop Internet Platform, Inc. ("Groop," d/b/a Talkspace), a behavioral healthcare company. As a result of the Merger, the owners of the pre-Merger Talkspace

business were expected to own approximately 50.8% of the common stock of the combined Company, on a fully diluted net exercise basis.

7.       From the date of the announcement of the HEIC-Groop Merger and continuing after the Merger was consummated, forming the publicly traded Talkspace, Defendants engaged in a continuous, intentional campaign of materially false and misleading statements and omissions designed to deceive public investors, including Plaintiffs.  These included statements, which were materially false and misleading when made, about, among other things: (i) HEIC's competitive advantage and due diligence capabilities; (ii) Talkspace's matching algorithm; (iii) management's focus on the business-to-consumer ("B2C") business rather than its business-to-business ("B2B") channel despite higher customer acquisition costs and lower conversion rates and demand in B2C; (iv) Talkspace's ability to correctly process health care claims in order to be reimbursed by insurers; (v) the number of "eligible lives" Talkspace covered; (vi) the Company's confidence in its management team; and (vii) Talkspace's internal controls.

8.       Unbeknownst to the investing public, including Plaintiffs, Defendants knew, or recklessly disregarded, a host of adverse facts at the time they made their statements which rendered their statements materially false and misleading.

9.       *First*, HEIC had overstated its competitive advantage and due diligence capabilities with respect to identifying and effectuating a merger with target companies, and HEIC had conducted inadequate due diligence into then-private, pre-Merger Talkspace ("Legacy Talkspace"), or else ignored and/or failed to disclose multiple red flags concerning then-private, Legacy Talkspace's business and operations.

10.      *Second*, Talkspace did not reveal that although customer conversion was an important growth driver—supported by its much-touted proprietary matching algorithm—users

had issues matching with providers or would not use the algorithm at all, negatively impacting conversion.

11. As Defendant Braunstein stated on Talkspace's earnings conference call for the fourth quarter of 2021, held on February 22, 2022, "the economic driver for [Talkspace] is conversion. . . . It's driving conversion and retention."

12. *Third*, due in part to these matching issues, and Defendant Oren Frank's ("Frank") unwillingness to pivot away from the B2C business towards the B2B business, Talkspace experienced significantly increased online advertising costs since the beginning of 2021, as well as lower conversion rates in its B2C business from online advertising.

13. As a result, Talkspace was experiencing more tepid B2C demand than represented to investors, leading to ballooning customer acquisition costs and worsening growth and gross margin trends.

14. *Fourth*, despite claiming that its technology platform was scalable, Talkspace had inadequate structures to timely process health care claims. Thus, Talkspace had overvalued its accounts receivables from certain of its Health Plan Clients (defined below), which amounts required adjustment downward.

15. *Fifth*, while claiming that "B2B eligible lives" was a "key business metric," Talkspace failed to tell its investors that it was double-counting people covered under multiple plans, thereby artificially inflating this key business metric.

16. *Sixth*, Talkspace publicly touted its management team to investors, all while privately discussing management succession plans, which were wrongfully concealed from investors such as Plaintiffs.

17. *Seventh*, Talkspace had undisclosed material weaknesses in its internal controls

over financial reporting, as well as its claims processing systems.

18.     *Finally*, as a result of the foregoing, Talkspace's 2021 financial guidance was not achievable and lacked any reasonable basis in fact at the time it was made.

19.     On August 8, 2021, after the market closed, HEIC, which had been renamed Talkspace following the June 22, 2021 Merger close, issued a press release announcing the Company's financial results for the second quarter of 2021 ("Q2 2021").  The next day, Talkspace held a conference call to discuss the Company's Q2 2021 results.  On the call, Defendants revealed certain issues related to increased customer acquisition costs due to rising digital advertising costs, while downplaying their impact, and confirmed a material increase in customer acquisition costs since the beginning of the year.

20.     On this news, Talkspace's stock price fell $1.11 per share, or 18.72%, to close at $4.82 per share on August 10, 2021.  Despite this decline in the Company's stock price, Talkspace securities continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements or omissions regarding Talkspace's true financial condition and prospects.

21.     Then, on November 15, 2021, after the market closed, Talkspace issued a press release announcing the Company's financial results for the third quarter of 2021 ("Q3 2021").  The press release disclosed, *inter alia*, that "[i]n the third quarter [Talkspace] ***increased the allowance for credit losses on receivables by $3.4 million, of which $2.8 million related to prior quarters***"; that a "***slowdown in the B2C business*** resulted in part from delays in launching new products and features, ***as well as a decline in conversion rates***"; that "[g]ross profit was $14.2 million in the third quarter, compared to $15.1 million in the prior-year quarter"; that "[g]ross margin was 54% compared to 70% a year ago"; and that "***[t]his decline was due to the increase in the reserve for***

***credit losses on receivables***, revenue mix shift towards B2B, and the continued investment in W2 therapist network."[1]

22.    In a separate press release issued the same day, Talkspace announced that, effective immediately, Defendant Frank was stepping down from his position as Chief Executive Officer ("CEO") and as a member of Talkspace's Board of Directors (the "Board").  Likewise, his wife, Roni Frank, was stepping down from her position as Head of Clinical Services and a Board member, effective that day.

23.    Talkspace also held a conference call the next day after the market had closed to discuss the Company's disappointing Q3 2021 results.  In his prepared remarks, Defendant Douglas L. Braunstein ("Braunstein") acknowledged: "[T]he overall financial results for the third quarter came in below expectations management shared with investors on our last earnings call. We're obviously disappointed by this performance and we have to do better."

24.    Following these press releases and the Q3 2021 conference call, Talkspace's stock price fell $1.23 per share, or 36.28%, to close at $2.16 per share on November 16, 2021.

25.    Then, on November 22, 2021, before the market opened, Talkspace announced that President and COO Mark Hirschhorn was resigning "effective immediately."  Following that announcement, Talkspace stock fell $0.16 per share, or 7.14%, to close at $2.08 per share on November 22, 2021, on volume of nearly 3 million shares, well above the average for the prior ninety trading days.

26.    After, and due to, the closing of the Merger, the price of Talkspace common stock declined precipitously as the truth about Talkspace and the Proxy's false and misleading nature was revealed over time.  By December 30, 2021, the price of Talkspace common stock was trading

---

[1] All emphasis is added unless otherwise stated.

below $2 per share, 80% below the price shareholders would have received if they had redeemed their shares instead of approving the Merger less than one year earlier. On July 29, 2022, Talkspace common stock closed at $1.87 per share.

27. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

28. Defendants' conduct was intentional. Defendants were highly motivated to make any statements—even materially false and misleading statements—that would encourage HEIC shareholders to vote for the Merger of HEIC and Talkspace. As a blank-check SPAC, if HEIC did not merge with an operating company within two years of its initial public offering (by June 11, 2022), it would be forced to repurchase all HEIC shares from public investors, and Defendants HEC Sponsor (defined below), Braunstein, Douglas G. Bergeron, Jonathan Dobres, Robert Greifeld, Amy Schulman, and Thelma Duggin, would lose their entire investment. Defendants were similarly motivated to keep the share price inflated throughout the remainder of the Class Period to benefit from their founder shares, as discussed further below. Moreover, without a merger, HEC Sponsor's 10,280,000 outstanding warrants would become worthless.

## II.    JURISDICTION AND VENUE

29. The claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a), and 78t(a), and SEC Rules 10b-5 and 14a-9 promulgated thereunder, 17 C.F.R. §§240.10b-5 and 240.14a-9, and 28 U.S.C. §1331. This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States of America.

30. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C.

§78aa and 28 U.S.C. §§1391(b)-(d).  Talkspace maintains its principal executive offices in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

31.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications, and the facilities of the NASDAQ, a national securities exchange.

## III.    PARTIES

### A.    Plaintiffs

32.    Steven Jacob Greenblatt is an individual investor in equity securities, among other securities, of public companies.  As set forth in the certification attached hereto as Exhibit 1, Steven Jacob Greenblatt purchased shares of Talkspace common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

33.    Montague Street LP is a Delaware incorporated limited partnership that invests in equity securities, among other securities, of public companies.  As set forth in the certification attached hereto as Exhibit 2, Montague Street LP purchased shares of Talkspace common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

34.    Greenblatt Family Investments LLC is a limited liability corporation that invests in equity securities, among other securities, of public companies.  As set forth in the certification attached hereto as Exhibit 3, Greenblatt Family Investments LLC purchased shares of Talkspace common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

35.    William Greenblatt is an individual investor in equity securities, among other

securities, of public companies. As set forth in the certification attached hereto as Exhibit 4, William Greenblatt purchased shares of Talkspace common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

36. Judith Greenblatt is an individual investor in equity securities, among other securities, of public companies. As set forth in the certification attached hereto as Exhibit 5, Judith Greenblatt purchased shares of Talkspace common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

37. The Brandon T. Greenblatt 2015 Trust is a trust that invests in equity securities, among other securities, of public companies. As set forth in the certification attached hereto as Exhibit 6, the Brandon T. Greenblatt 2015 Trust purchased shares of Talkspace common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

38. The Maggie S. Greenblatt 2015 Trust is a trust that invests in equity securities, among other securities, of public companies. As set forth in the certification attached hereto as Exhibit 7, the Maggie S. Greenblatt 2015 Trust purchased shares of Talkspace common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

39. The Steven Jacob Greenblatt 2015 Trust is a trust that invests in equity securities, among other securities, of public companies. As set forth in the certification attached hereto as Exhibit 8, the Steven Jacob Greenblatt 2015 Trust purchased shares of Talkspace common stock during the Class Period and suffered damages due to Defendants' violations of the federal securities laws alleged herein.

40. Lead Plaintiff Baron held Talkspace common stock as of the May 19, 2021 Record

Date for the Merger and was entitled to vote on the Merger at the June 17, 2021 special meeting

of shareholders.  As set forth in the certification attached hereto as Exhibit 9, Baron also purchased

shares of Talkspace common stock during the Class Period and suffered damages due to

Defendants' violations of the Exchange Act alleged herein.

### B.    Defendants

#### 1.    Defendant Talkspace

41.    Defendant Talkspace[2] is a behavioral healthcare company with headquarters in

New York, New York.  Talkspace common stock and warrants are traded publicly on the

NASDAQ under the ticker symbols "TALK" and "TALKW," respectively.  Prior to the Merger,

Talkspace was named HEIC, and its stock, warrants, and ownership units were traded publicly on

the NASDAQ under the ticker symbols "HEC," "HECCW," and "HECCU," respectively.

#### 2.    Management Defendants

42.    Defendant Frank co-founded Talkspace[2] in 2012 with his wife Roni Frank, and

served as CEO and a director of the Company following the Merger.  On November 15, 2021, the

Company announced that Defendant Frank and his wife, who was Head of Clinical Services and

a Company director at the time, were stepping down from their roles effective immediately.

Defendant Frank signed the 10-Q for the second quarter of 2021, filed August 9, 2021 (the "Q2

2021 10-Q").

43.    Defendant Mark Hirschhorn served as President and Chief Operating Officer

("COO") of Talkspace starting in February 2020.  He also served as the Chief Financial Officer

("CFO") of the Company from February 2020 until July 25, 2021.  On November 22, 2021,

Talkspace announced Hirschhorn's immediate resignation purportedly following an internal

---

[2] "Talkspace" as used herein, refers to the business and operations of the Company.  Prior to the
Merger, Talkspace was a private company but merged with and into the Company as a result of
the Merger.

review of unspecified misconduct the prior week.

### 3.    Proxy Defendants

44.    Defendant Braunstein was the co-founder, President, and Chairman of HEIC at the time of the Merger.  Braunstein was also a member of the HEC Sponsor, a beneficial owner of shares held by the HEC Sponsor, and shared voting and investment discretion with respect to the common stock held of record by the HEC Sponsor.  Braunstein founded Defendant Hudson Executive Capital LP and serves as its co-managing partner.  After the Merger, Defendant Braunstein served as Chairman of Talkspace's Board and was subsequently appointed interim CEO, effective November 15, 2021, upon Defendant Frank's resignation.  Defendant Braunstein signed the Proxy and the Form 10-K for the full year ended December 31, 2020 (the "2020 10-K").

45.    Braunstein's wife, Samara H. Braunstein, served as Chief Marketing Officer of Talkspace before and after the Merger.  Through his wife, Defendant Braunstein had unique access to Talkspace's business, operations, and prospects prior to the Merger, including the adverse facts concealed from investors as alleged herein.

46.    Defendant Bergeron was CEO and a director of HEIC at the time of the Merger. Bergeron was also a member of the HEC Sponsor, a beneficial owner of shares held by the HEC Sponsor, and shared voting and investment discretion with defendant Braunstein with respect to the common stock held of record by the HEC Sponsor.  He is also a managing partner of Hudson Executive Capital LP.  Defendant Bergeron signed the Form 10-Q for the second quarter of 2020, filed August 14, 2020 (the "Q2 2020 10-Q"), the Form 10-Q for the third quarter of 2020, filed November 16, 2020 (the "Q3 2020 10-Q"), the 2020 10-K, and the 10-Q for the first quarter of 2021, filed May 18, 2021 (the "Q1 2021 10-Q").

47.    Defendant Dobres was the CFO of HEIC at the time of the Merger.  Defendant Dobres signed the Q2 2020 10-Q, the Q3 2020 10-Q, the 2020 10-K, and the Q1 2021 10-Q.

48.     Defendant Duggin was a director of HEIC at the time of the Merger.  Defendant Duggin signed the 2020 10-K.

49.     Defendant Greifeld was a director of HEIC at the time of the Merger.  Defendant Greifeld signed the 2020 10-K.

50.     Defendant Schulman was a director of HEIC at the time of the Merger.  Defendant Schulman signed the 2020 10-K.

51.     Defendants Braunstein, Bergeron, Dobres, Duggin, Greifeld, and Schulman are collectively referred to herein as the "Proxy Defendants."

52.     Defendants Frank, Hirschhorn, Braunstein, Bergeron, Dobres, Duggin, Greifeld, and Schulman are collectively referred to herein as the "Individual Defendants."  The Proxy was issued "By Order of the Board of Directors" and the Board "unanimously recommend[ed] that [shareholders] vote or give instruction to vote 'FOR'" the proposals in the Proxy, including the Merger.  Because of the Individual Defendants' management positions with respect to HEC, the HEC Sponsor, HEIC, and/or Talkspace, and relevant stock ownership, they each had authority over the information contained in the Proxy.

### 4.     Blank Check Sponsor Defendants

53.     Defendant HEC Sponsor LLC ("HEC Sponsor" or the "Sponsor") served as the blank check sponsor of Talkspace.

54.     Defendant Hudson Executive Capital LP ("HEC") is an investment advisory firm founded by Braunstein and co-managed by Braunstein and Bergeron for the purposes of creating SPACs and effectuating blank check initial public offerings and mergers.  At the time the Merger was announced, HEC managed over $1.5 billion in assets.  HEC founded the SPAC HEIC and launched and controlled the HEC Sponsor for the benefit of Defendants Braunstein and Bergeron.

55.     Defendant HEC Master Fund LP ("HEC Fund") is an investment fund established

by HEC for the purpose of allowing HEC, Braunstein, and Bergeron to invest in and otherwise enter into contractual relationships with HEIC for their own pecuniary interests.  In connection with the Merger, HEC Fund entered into a forward purchase agreement with HEIC, as amended on January 12, 2021, pursuant to which HEC Fund agreed to: (1) purchase 2,500,000 Forward Purchase Units (consisting of one share of Class A common stock and one-half of one warrant to purchase one share) for $10 per unit; and (2) backstop up to $25,000,000 of shareholder redemptions by HEIC stockholders.

56.     Defendants HEC, HEC Sponsor, HEC Fund, Braunstein, Bergeron, Dobres, Duggin, Greifeld, and Schulman are collectively referred to herein as the "Blank Check Sponsor Defendants."

### C.     Non-Party Jennifer Fulk

57.      On July 15, 2021, the Board appointed Jennifer Fulk ("Fulk") as CFO, effective July 26, 2021.  Fulk signed the Q2 2021 10-Q.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.     Background

58.     Talkspace is a behavioral healthcare company that Defendant Frank and his wife, Roni Frank, co-founded in 2012 after themselves allegedly benefiting from couples' therapy. Talkspace claimed that since its founding, it has connected "millions" of patients, or members, with licensed mental health providers across a wide and growing spectrum of care through virtual counseling, psychotherapy, and psychiatry, on its much-touted "purpose-built technology platform," *i.e.*, via text messaging, audio, and video.

59.     As described in HEIC's press release filed on January 13, 2021, "Talkspace promotes behavioral health as a lifestyle, not as a one-time event."

60.     Talkspace's platform serves two different business channels: (1) B2C, comprised

of individual consumers who subscribe directly on Talkspace's platform; and (2) B2B, comprised of large enterprise clients such as Google and Expedia, and large health plans and employee assistance programs (collectively, "Health Plan Clients") such as Aetna, Cigna, Premera, Humana, and Optum, who offer their employees and insured members access to Talkspace's platform for free or at in-network reimbursement rates, respectively.  The B2C channel has a range of subscription packages; some allow for asynchronous treatment with unlimited text, video, and audio messaging, as well as a range of scheduled, live or audio visits.

61.    Upon signing up with Talkspace, users are asked to choose between being interviewed by an automated chatbot (a software application used to conduct an online chat conversation via text in lieu of providing direct contact with a live human agent) or a licensed therapist to match them to a therapist, who would then provide them with services.

62.    Throughout the Class Period, Talkspace touted itself as "[t]he strongest brand in digital behavioral health," with a "[m]ulti-faceted marketing approach [that] is core to success in [the] consumer market":



63.    The coronavirus pandemic further drove the growth of the Company; not only were people less likely to opt for a face-to-face therapy session, but the viral pandemic also aggravated and shined a spotlight on America's acute mental health crisis.

64.    **Matching Algorithm Supporting Conversion.**    Talkspace boasted of its core technology platform as a means of differentiating it from its competitors, such as BetterHelp. Talkspace used machine learning to collect data in real-time, purportedly to increase and improve engagement and diagnoses.    The platform was also used to match users to therapists using a machine-learning algorithm:



65.    During the January 13, 2021 conference call, Defendant Frank emphasized that "[t]his ability to ***actually match the right provider in a qualitative manner*** is a huge breakthrough in the delivery of behavioral healthcare, and ***is informed and powered by our technology platform***."

66.    Indeed, on that call, Defendant Frank explained that a match would only take a few hours: "Talkspace's [user agreement] and user experience delivers the first contact in under two minutes with a licensed professional who will do the matching, and ***very close to 100% matching in the very same day***, typically three to four hours after beginning the matching process."

67.    This artificial intelligence program was also a means for Talkspace to measure clinical outcomes, and to evaluate potential therapists.    Thus, the Company's machine learning model purportedly led to higher conversion and retention rates, as it was advertised that Talkspace would provide an immediate match, and was more effective than face-to-face visits.

68.     But despite having touted its "proprietary matching algorithm," Talkspace was either not using its matching function or having issues matching users to therapists.  Because there were not enough people to onboard users, and users were not using the algorithm, Talkspace was doomed to have declining conversion and retention rates in the B2C channel, leading to lower revenues, an issue that plagued the Company, as disclosed on November 15, 2021.

69.     Ultimately, as Defendant Braunstein admitted on the earnings call for the first quarter of 2022, held on May 3, 2022, Talkspace had to "change[ its] matching function."  The Company had not been using its much-touted algorithm to match customers to therapists, though "customers . . . prefer[red] for [Talkspace] to use [its] algorithm to match them to a therapist."  This "change"—actually using the algorithm to create matches, as investors had expected the Company was already doing—"had a meaningful impact on [Talkspace's] conversion."

70.     **Conversion and Retention.**  Talkspace also boasted a retention rate of an average of five months (which, according to analysts from Cowen, was a "key differentiator" of the platform as compared to other virtual behavioral health companies).  Indeed, analysts from William Blair noted that Talkspace's "high customer retention rates" added to its "compelling" financial model.

71.     Defendant Frank stated on the January 13, 2021 conference call announcing the Merger that "***the conversion*** or the efficiency of the funnel ***[was] dramatically enhanced***[,]" as compared to traditional face-to-face therapy.

72.     **B2B Eligible Lives.**  Moreover, according to Defendant Hirschhorn on the January 13, 2021 conference call, Talkspace planned to "***aggressively . . . expand [its] B2B segment***, through both the addition of new employer and Health Plan Clients, as well as focusing on driving deeper penetration rates within our existing contracts."

73.    To that end, Talkspace measured and reported key business metrics for each of its business channels, including B2B eligible lives (the number of enterprise and Health Plan Clients eligible to receive treatment on the Talkspace platform, in the case of its enterprise clients) and monthly active members.  Indeed, in a letter to the SEC on March 18, 2021, Talkspace wrote that it "believes that [one of] the metrics *most meaningful to investors* in evaluating the performance of Talkspace at this time . . . [is] *B2B eligible lives*, Health Plan Clients and enterprise clients[.]"

74.    Analysts, including at Cowen, SVB Leerink, and William Blair, believed that the B2B channel would provide greater visibility into future revenues from longer lasting, contracted relationships, and, notably, less exposure to increasing and fluctuating customer acquisition costs.

75.    On May 18, 2021, HEIC announced that in the first quarter of 2021, Talkspace had "*[e]xecuted on [its] B2B growth strategy*, adding a combined 32 million eligible lives between April 1, 2020 and March 31, 2021."  As reported by William Blair on July 19, 2021, "the company continue[d] to expand into B2B sales to enterprises and health plans.  More specific, while only representing roughly 2 million eligible lives to start 2019, Talkspace partnerships represented nearly 42 million eligible lives on its platform at the end of first quarter 2021, and 55 million as of May 1, 2021."  Those analysts also noted that the B2B sales stream was "[d]riven largely by growth in eligible lives."

76.    However, the investing public, including Plaintiffs, did not know until November 15, 2021, that the calculation of the number of B2B eligible lives, one of Talkspace's key business metrics, included double-counting (*i.e.*, if someone was covered by more than one plan, he would be counted each time as an "eligible life"), and was thus artificially inflated.

77.    Investors were also unaware that even though customer acquisition costs (sometimes referred to as "CAC") were higher and less predictable for B2C as compared to B2B,

17

Defendant Frank was more committed to continuing to grow B2C, which was his "brainchild," as explained by Talkspace's former Director of Strategy Tarun Galagali in an interview with Tegus, Inc. ("Tegus") on April 5, 2022.  Galagali told Tegus that—even though Talkspace had publicly committed to shifting to the B2B space—Defendant Frank "just didn't have too much knowledge over payers or enterprises in the landscape[,]" and, when the Company went public, "it just became very obvious there was a deficit [of] knowledge from his perspective."

78.     The Company's double-counting its eligible lives in the B2B business misleadingly conveyed to investors that the B2B business was still growing quickly and that the Company remained dedicated to "aggressively" expanding the segment.

79.     As Yashas Singri, former Product Operations and Strategy/Revenue Operations Lead at Talkspace, put it in an interview with Tegus on April 7, 2022, there was a "misalignment at the executive level with the Board where B2B made economic sense," but Defendant Frank saw B2C as his "baby and this is how it's operated."

80.     **Scalability.**  Moreover, Talkspace did not have the proper automated systems in place to timely manage health care claims, and instead was processing these claims manually, thereby imperiling the Company's ability to be ultimately reimbursed for these claims.  On the earnings call for the fourth quarter of 2021, held on February 22, 2022, Defendant Braunstein explained that the operational systems that Talkspace previously lacked included a "billing and claims management system."   Having only started to implement those systems, Defendant Braunstein noted that Talkspace "expect[ed they would] meaningfully reduce reserves and increase cash collections" from the B2B business.  Defendant Braunstein also explained that Talkspace had previously lacked, and was now implementing, a "full financial accounting and reporting team to improve both our reporting, our controls, and ultimately . . . become a better

allocator of the shareholders' capital."

81.     On the same call, Defendant Braunstein admitted that Talkspace had only just "recently" launched Superbills, which would help members expedite reimbursements for mental health service claims.  When Galagali joined the B2B team in August 2020, the Company did not "even have Salesforce," which provides companies with customer relationship management software and applications, "integrated fully," even though Talkspace already had ten or twelve customers.

82.     Singri explained that there was "a lack of operational rigor around the operations of the business.  And that was also a really big problem [Defendant Frank] maybe didn't pay as much attention to as [he] should have."

83.     **Strength of Management.**  Furthermore, in urging the Merger, and thereafter, Talkspace continually touted the strength of the management team that would lead Talkspace after the Merger.  For example, during a conference call on January 13, 2021, Defendant Braunstein stated, "we think we are partnering with a truly wonderful management team.  They are leaders in the field.  They are innovators.  They have deep experience and we believe our partnership with the executives at Hudson create a 1+1=3 opportunity for investors."  Similarly, on January 14, 2021, Defendant Braunstein told Bloomberg TV that the "first" thing that differentiated Talkspace from other targets "was the personal chemistry between Oren and Roni and Mark and the management team, and our executives. . . . [Y]ou need to be partnered with people you feel have a similar mission and a similar vision for how the business is going to grow."

84.     Indeed, Defendant Frank stressed the importance of the management team during the January 13, 2021 call announcing the Merger that Talkspace was "all about the people even more than ever before."

19

85.     In an internal letter published pursuant to SEC Rule 425 on January 15, 2021, Defendant Frank assured Talkspace employees that after the Merger, he and his wife, Roni Frank, would "stay in [their] jobs."

86.     What investors did not know, however, was that as early as June 2021, Talkspace's management and its Board were discussing succession plans to replace Talkspace's then-current management team—including Defendant Frank, who was unwilling to focus on the burgeoning B2B channel.

87.     Indeed, Galagali told Tegus that Defendant Frank had stated before the Merger, that "if we ever go public, you won't see me sticking around here because I'm not good at that."

88.     According to Galagali, "[t]he culture of the company is not good[,]" and he thinks "there [are] whispers around the industry about the culture of Talkspace."

**B.     The Merger and Talkspace as a Public Company**

**1.     SPACs In General**

89.     The company currently known as Talkspace began as HEIC, a blank check SPAC formed by the Blank Check Sponsor Defendants.

90.     A "blank check" company is one with no specific established business plan or purpose, or that has indicated that its plan is to merge with or acquire an unidentified company, entity, or person.

91.     A SPAC is a blank check company that does not initially have any operations or business of its own.  Instead, it raises money from investors in an initial public offering and then uses the proceeds from the offering to acquire a business or operational assets, usually from a private company that does not publicly report financial or operating results.  As a result, investors in blank check companies must rely on the skill, transparency, and honesty of the blank check company's sponsor to spend the offering proceeds to acquire a fundamentally sound target

company that offers attractive risk-adjusted returns for investors.

92.     The target company cannot be identified before the SPAC completes its IPO.  At least 90% of the capital raised in the IPO must be deposited into a trust account, with the interest paid to the investors.  The SPAC's management team must identify and acquire a target company within a specified time period, typically between 18 and 24 months.  Under NASDAQ rules, the target company must have a fair market value equal to 80% of the balance in the SPAC's trust account.  If the SPAC's management team fails to acquire a target company within the specified time period, then the SPAC is dissolved and the IPO proceeds are returned to the investors.  No salaries, finder's fees, or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination.  As explained by one commentator, SPACs "are a form of reverse merger," a term used when "a successful private company merges with a listed empty shell to go public without the paperwork and rigors of a traditional IPO."  Ivana Naumovska, *The SPAC Bubble is About to Burst*, HARVARD BUSINESS REVIEW (Feb. 18, 2021), https://hbr.org/2021/02/the-spac-bubble-is-about-to-burst.

93.     Beginning in 2021, the SEC's Investor Advisory Committee ("IAC") began examining SPACs with an eye toward proposing that the SEC regulate SPACs more intensively, with enhanced focus and stricter enforcement of existing disclosure rules under the Exchange Act. While legitimate vehicles when used by responsible sponsors and managers, unscrupulous sponsors and management could abuse the SPAC vehicle for their own benefit.  In laying out its case for greater transparency, the IAC prepared the following background statement on SPACs:

> In simple terms, a SPAC is a type of "blank-check" company that raises capital through an initial public offerings ("IPO") with the intention to use the proceeds to acquire other companies at a later time.  Unlike traditional IPOs, SPACs do not have commercial operations at the time of the IPO, which explains why they are referred to as "blankcheck" or "shell" companies.  SPACs first

appeared in the 1980s but have gained accelerating popularity in recent years, especially since 2020. . . . After the SPAC completes a merger with the target company, the previously privately held target company becomes a publicly listed operating company. This last step of creating the listed successor company is referred to as a "de-SPAC" transaction.

SPACs can be an attractive option for sponsors because they can raise money rapidly without having to deal with company preparation or company specific disclosure at the time of the IPO. . . . *Furthermore, the transactions by their very nature are complex and have some misalignments between the initial investors, sponsors, investors in the target and any intermediate financiers joining the de-SPAC transaction.*

94.     The SEC's (well-founded) concern about misalignment between unscrupulous sponsors and investors arises from the fact that the sponsors have a greater incentive to identify a target and consummate a deal—regardless of the long-term prospects of that deal—thereby enabling the sponsor to monetize its so-called founder shares and avoid having to return the original investment principal to the SPAC's shareholders, even if that means consummating a transaction that is bad for, and not well-disclosed to, ordinary investors. While many SPAC sponsors have no doubt analyzed deals with an eye toward what is good for both themselves and investors, many others have not. Thus, as the SEC has cautioned, in describing the two-step nature of SPAC transactions:

A SPAC is a shell company with no operations. It proceeds in two stages. In the first stage, it registers the offer and sale of redeemable securities for cash through a conventional underwriting, sells them primarily to hedge funds and other institutions, and places the proceeds in a trust for a future acquisition of a private operating company. Initial investors also commonly obtain warrants to buy additional stock as at a fixed price, and sponsors of the SPAC obtain a "promote"—greater equity than their cash contribution or commitment would otherwise imply—and their promote is at risk. If the SPAC fails to find and acquire a target within a period of two years, the promote is forfeited and the SPAC liquidates.

95.     Thus, before the SPAC files for its IPO, the sponsor will pay a nominal amount, often $25,000, for founder shares, which gives them up to 20% of the total shares outstanding after the IPO is completed.  Those shares are then typically redeemable when the de-SPAC transaction is consummated.

96.     On March 30, 2022, the SEC proposed additional rules to align the requirements for SPAC transactions with those for registration statements in an initial public offering. According to the SEC, the rules are intended to further enhance investor protections in SPAC IPOs, as well as in subsequent business combinations between SPACs and private operating companies, targeting unscrupulous sponsors and management.  The rules would require further disclosures about, among other things, SPAC sponsors and conflicts of interest.

97.     Massachusetts Senator Elizabeth Warren, who has released a 26-page report about SPACs, has stated that sponsors' incentives do not align with those of investors, and "that Wall Street insiders have used SPACs as their own personal piggy banks while retail investors have suffered.  This industry is rife with fraud, self-dealing, and inflated fees, and the SEC and Congress should continue to act to crack down on these abuses."  *New Report from Senator Warren: The SPAC Hack: How SPACs Tilt the Playing Field and Enrich Wall Street Insiders*, ELIZABETH WARREN  (May 31,  2022),  https://www.warren.senate.gov/oversight/reports/new-report-from-senator-warren-the-spac-hack-how-spacs-tilt-the-playing-field-and-enrich-wall-street-insiders.

98.     As stated by SEC Chair Gary Gensler, "it's important to consider the economic drivers of SPACs.  Functionally, the SPAC target IPO is being used as an alternative means to conduct an IPO.  Thus, investors deserve the protections they receive from traditional IPOs, with respect to information asymmetries, fraud, and conflicts, and when it comes to disclosure,

marketing practices, gatekeepers, and issuers." [3]

99.    The Merger is an example of unscrupulous Defendants using the potentially abusive

structure of SPACs to engineer a great deal for themselves at the expense of ordinary investors.

### 2.    The Groop/HEIC Merger

100.    The general terms summarized above applied to the Merger.

101.    On May 21, 2020, HEIC filed a registration statement on Form S-1 with the SEC

in connection with the IPO, which, after amendment, was declared effective by the SEC on June 8,

2020 (the "Registration Statement").

102.    On June 10, 2020, HEIC filed a prospectus on Form 424B4 with the SEC in

connection with the IPO, which formed part of the Registration Statement (the "Prospectus" and,

together with the Registration Statement, the "Offering Documents").

103.    On or about June 11, 2020, HEIC completed its initial public offering, selling 41.4

million ownership units (including the issuance of 5.4 million units as a result of the underwriters'

exercise of their full overallotment option) to investors at $10 per unit for gross proceeds of $414

million (the "IPO").  Each unit consisted of one share of Class A common stock and one-half of

one redeemable warrant, with each whole warrant exercisable to purchase one share of Class A

common stock at a price of $11.50 per share, subject to certain adjustments.  The IPO was

sponsored by Defendant HEC Sponsor, an affiliate of Defendant HEC.

104.    While HEIC did not identify any target companies at the time of the IPO, the IPO

Offering Documents stated that the Company intended to focus its search for an initial business

combination in two industry sectors: (1) financial services, with a focus on financial technology;

---

[3] *SEC Proposes Rules to Enhance Disclosure and Investor Protection Relating to Special Purpose Acquisition Companies, Shell Companies, and Projections* (Mar. 30, 2022), https://www.sec.gov/news/press-release/2022-56#:~:text=Functionally%2C%20the%20SPAC%20target%20IPO,%2C%20gatekeepers%2C%20and%20issuers.%22.

and (2) healthcare, including healthcare information technology, services, and products.  The IPO

Offering Documents claimed that HEIC's "management team's direct industry expertise,

operational experience and strategic backgrounds, our relationship with Hudson Executive Capital,

and our management team's and Hudson Executive Capital's network of relationships and

executives . . . provide us with a competitive advantage in both of our intended industry sectors of

focus."  The IPO Offering Documents explained further:

> In particular, we believe we will benefit from our access to Hudson
> Executive Capital's network of more than 30 current and former
> public company chief executive officers and other senior executives,
> which we refer to as the CEO Network, many of whom have been
> members of such network since Hudson Executive Capital's
> inception and the majority of whom are current or past leaders in the
> financial services or healthcare industries.
>
> *       *       *
>
> The CEO Network provides Hudson Executive Capital with unique
> idea generation, proprietary transaction sourcing, perspective and
> support during target due diligence, operating experience and
> participation in or recommendations for management and director
> roles, as well as execution resources.

105.    The IPO Offering Documents listed the "Investment Criteria" HEIC would

purportedly use to evaluate target companies including:

> •       Companies with an "attractive valuation with multiple
> drivers for future growth."
>
> •       Companies that have "a sustainable competitive advantage
> within a target market as a result of differentiated technology,
> distribution capabilities, customer service, or other attributes that
> provide high barriers to entry.  The target business should have
> characteristics that are difficult to replicate and have multiple areas
> for growth."
>
> •       Companies that have a "highly visible revenue model, good
> underlying growth prospects, and strong operating margins leading
> to strong and sustainable free cash flow capabilities."
>
> •       Companies "where the collective capabilities of HEIC's
> management [could] be leveraged to tangibly improve the

operations and create value."

- Companies that "[u]nderstand[] the [b]enefits of being [p]ublic."

106.    Pursuant to the IPO Prospectus, HEIC was required to acquire a target business with an aggregate fair market value of at least 80% of the assets held in trust within 24 months of HEIC's IPO.  In the event HEIC did not timely complete an initial business combination, the Company was obligated to redeem 100% of its outstanding public shares equal to the aggregate proceeds remaining in trust, plus interest.  Moreover, shareholders could redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction.  If enough shareholders redeemed their shares, a deal would not be economically feasible.

107.    However, if HEIC was successful in timely completing an initial business combination, the Blank Check Sponsor Defendants would be richly rewarded.  Specifically, HEIC had issued founder shares in connection with the IPO equal to approximately 20% of the Company's outstanding common shares after the IPO (including the full exercise of the underwriter's overallotment option).  Defendant HEC Sponsor held almost all these founder shares.  According to HEIC, these founder shares had a market value of $102.5 million as of the shareholder Record Date for the Merger, but would expire worthless if the Company failed to complete its initial business combination in time.  In addition, HEC Sponsor had purchased $10.28 million worth of private placement HEIC warrants prior to the Merger, which would be rendered worthless by a failure to consummate an initial business combination.  As a result, the Blank Check Sponsor Defendants were highly incentivized to complete an initial business combination and to convince shareholders to approve the Merger.

108.    On January 13, 2021, HEIC issued a press release announcing that it had entered

into a merger agreement with Talkspace, to be funded by $414 million in cash in trust from HEIC's IPO, HEIC common stock, $300 million of gross proceeds from a fully committed Private Investment in Public Equity transaction at $10 a share, a $25 million forward purchase agreement by HEC Fund to purchase stock and warrants, and a $25 million commitment by HEC Fund to backstop redemptions. As a result of the Merger, the owners of the pre-Merger Talkspace business were expected to own approximately 50.8% of the common stock of the combined Company, on a fully diluted net exercise basis.

109.    Defendant Braunstein described Talkspace in the January 13, 2021 press release as a "'purpose-built technology company designed to meet the unmet medical needs in behavioral health by improving access, decreasing costs, improving outcomes, and creating value for patients, providers, and employers.'"

110.    The press release also highlighted Talkspace's purportedly "robust user growth," "with approximately 46,000 active members, and more than 39 million lives covered by employer or healthcare insurance agreements." The press release further stated that Talkspace was on track to continue this growth for the remainder of the year: "For 2021, Talkspace's estimated net revenue is $125 million, up approximately 69% from 2020 estimated net revenue."

111.    On May 28, 2021, defendants issued the definitive proxy statement for the Merger which urged shareholders to vote in favor of the deal. The Proxy contained numerous materially false and misleading statements and omissions as detailed below. Specifically, the Proxy misrepresented Talkspace's business, financials, and prospects, by omitting, *inter alia*, that: (i) HEIC had overstated its competitive advantage and due diligence capabilities with respect to identifying and effectuating a merger with target companies, and HEIC had conducted inadequate due diligence into then-private, pre-Merger Talkspace, or else ignored and/or failed to disclose

multiple red flags concerning then-private, pre-Merger Talkspace's business and operations; (ii) Talkspace touted its proprietary matching algorithm, but users had issues matching with providers; (iii) in part due to these matching issues, Talkspace was experiencing significantly increased online advertising costs in the B2C business since the beginning of 2021, as well as lower conversion rates from its online advertising in its B2C business; (iv) as a result, Talkspace was experiencing more tepid B2C demand than represented to investors, leading to ballooning customer acquisition costs and worsening growth and gross margin trends; (v) despite claiming that its technology platform was scalable, Talkspace had inadequate structures to timely process health care claims, and consequently, Talkspace had overvalued its accounts receivables from certain of its Health Plan Clients, which amounts required adjustment downward; (vi) Talkspace was double-counting people covered under multiple plans thereby artificially inflating one of its key business metrics; (vii) Talkspace did not have confidence in its current management team and was secretly discussing management succession plans; (viii) Talkspace had material weaknesses in its internal controls over financial reporting, as well as its claims processing systems; and (ix) as a result of the foregoing, Talkspace's 2021 financial guidance was not achievable and lacked any reasonable basis in fact.

**C.    The Truth Concerning Talkspace's Business Is Quickly Revealed Following the Merger**

112.    On the basis of the defective Proxy, at a special shareholder meeting on June 17, 2021, HEIC shareholders voted to approve the Merger.  Following the consummation of the Merger on June 22, 2021, HEIC changed its name to Talkspace, Inc.

113.    On August 10, 2021, Talkspace issued a press release announcing the Company's financial results for Q2 2021 and held a conference call to discuss the Company's results. Defendants Frank and Hirschhorn oversaw the call.  On the call, Defendant Frank revealed some

of the issues relating to increased CAC, blaming those increased costs on rising digital advertising costs, while simultaneously downplaying their impact.  For example, Defendant Frank stated, in pertinent part, as follows:

> While our B2C revenue grew substantially, we and many other of our peers are experiencing elevated customer acquisition costs due mainly to a material increase in the cost of digital advertising.
>
> *As a result of this environment, we're taking a number of steps which we believe further strengthens our business: First we increased our advertising budget, which . . . we believe will ultimately increase member's retention, engagement and satisfaction*.

114.     Defendant Hirschhorn confirmed the material increase in customer acquisition costs stretching back to the beginning of 2021, stating, in pertinent part, as follows:

> Adjusted EBITDA loss was $12 million in the second quarter 2021 compared to a loss of $300,000 in the second quarter 2020.  *As Oren mentioned, CAC has been meaningfully elevated since the beginning of the year relative to prior periods.  The majority of the excess losses in the quarter relative to initial expectations can be attributed to this increase in customer acquisition cost.  While advertising costs have dramatically increased during the first half of this year*, the current environment makes it more difficult to predict when customer acquisition costs will ultimately normalize.  As such, we will not be providing any update to guidance on EBITDA for the remainder of this year.

115.     Likewise, in response to an analyst question about the fact that the number of active members in the B2C channel was down sequentially from the first quarter of 2021 (and thus below expectations), Hirschhorn stated, in pertinent part, as follows:

> We were very deliberate this quarter, and we continue to really focus on the fact that there's really punitive pricing in the market today.  There is a tremendous price disparity in customer acquisition costs this year, as compared to where we were in the second quarter of 2020.  The frequency of price increases is somewhat dramatic from Facebook and Google and the other digital properties.  And we are spending what we believe is appropriate to maintain our competitive advantage in our leading brand.  But, we're going to continue to look to  obviously  now  diversify  our  acquisition  channel  through

29

investments in non-traditional channels as well as looking to partner with some of the nation's leading companies. I think it's unlikely that we are going to see a dramatic shift downward in the next quarter or two, but we do believe that CAC will stabilize because these are quite frankly levels—I'd say elevated levels that we don't believe are sustainable, nor have we ever seen increases like this— really since this, I'd say past two to three years has been. We've been tracking this clearly over the last five years.

116. Despite these disclosures, Defendants did not reveal the full truth about Talkspace to the investing public, including Plaintiffs. Talkspace stock remained artificially inflated.

117. For example, in the August 9, 2021 press release, Talkspace **reaffirmed** its prior fiscal year 2021 net revenue guidance of $125 million and stated that the Company's outlook for net revenue for Q3 2021 was $32 million. Defendant Frank told investors on the conference call the next day:

> Our $31 million in net revenue for the second quarter was a quarterly record for the company and represents 73% year-over-year growth. B2C net revenue for the second quarter was $21 million, up 36% year-over-year, and up 14% sequentially. Of particular note, our B2B revenue grew 320% year-over-year to $10 million and we have a robust pipeline of B2B clients in revenue opportunities. As a result, *we are on track to meet our revenue guidance of $125 million*, growing our revenue by 64% for the fiscal year of 2021.

118. The press release further quoted Defendant Frank discussing the Company's results in Q2 2021, stating, in pertinent part, as follows:

> We continued to experience broad-based momentum throughout our business in the second quarter, driven by *significant demand tailwinds* and a generational shift to virtual care. Our differentiated and comprehensive product portfolio continues to resonate in the marketplace, and we are seeing traction in both expanding our offering within existing clients as well as adding new clients. We are ideally positioned to address the vast, unmet and growing demand for mental health services in innovative ways, and we are excited to keep executing on our strategy.

119. Moreover, the press release reported a 67.0% increase in eligible lives, a term that was defined as follows (with no further explication):

We consider B2B lives "eligible" if such persons are eligible to receive treatment on the Talkspace platform, in the case of its enterprise clients, for free when their employer is under an active contract with Talkspace, or, in the case of health plan clients, at an agreed upon reimbursement rate through insurance under an employee assistance program or other network behavioral health paid benefit program.

120.    Then, on November 15, 2021, after the market closed, Talkspace issued a press release announcing the Company's dismal financial results for 3Q 2021.  The press release quoted Fulk as stating, in pertinent part, as follows:

While Net Revenue grew 23% year-over-year, driven by continued momentum in the B2B business, the overall financial results for the third quarter were disappointing.  Q3 Net Revenue came in below management expectations due to a lower number of B2C customers and a one-time non-cash reserve adjustment for credit losses on receivables related to prior periods.

121.    The press release further stated, in pertinent part, as follows:

•    Net Revenue . . . came in below expectations due to a *lower number of acquired customers in the direct-to-consumer business and an adjustment to reserves*, which was only partially offset by growth in the B2B Gross Revenue.

•    In the third quarter we *increased the allowance for credit losses on receivables by $3.4 million, of which $2.8 million related to prior quarters*.  Excluding the impact of this one-time non-cash adjustment, consolidated Revenue would have been $29.2 million, up 37% year-over-year.

•    Direct-to-consumer Revenue was $18.6 million, a 10% year-over-year increase in the third quarter.  *The slowdown in the B2C business resulted in part from delays in launching new products and features, as well as a decline in conversion rates*.

*         *         *

•    Gross profit was $14.2 million in the third quarter, compared to $15.1 million in the prior-year quarter.  Gross margin was 54% compared to 70% a year ago.  This decline was due to the increase in the reserve for credit losses on receivables, revenue mix shift towards B2B, and the continued investment in W2 therapist network.

122.    In a separate press release issued the same day, Talkspace announced that the co-founders of Talkspace were leaving the Company.  Specifically, effective immediately—and less than five months after the Merger—Defendant Frank was stepping down from his position as CEO and as a Board member, and his wife, Roni Frank, was stepping down from her position as Head of Clinical Services and Board member.

123.    In the 10-Q filed that day, Talkspace finally explained, for the first time, how it calculates the number of "eligible lives" reported as a key business metric in its SEC filings.  If a user was covered by more than one plan, he would be double counted—thereby artificially inflating the number of eligible lives that Talkspace reported:

> There may be instances where a person may be covered through multiple solutions, typically through behavioral health plans and employee assistance programs.  ***In these instances, the person is counted each time they are covered in the B2B eligible lives calculation, which may cause this amount to reflect a higher number of members than we actually serve.***

124.    Talkspace also held a conference call after the market closed to discuss the Company's disappointing Q3 2021 results.  Defendant Braunstein, then both Chairman of the Board and Interim CEO, oversaw the call.

125.    In his prepared remarks, Defendant Braunstein explained that one of the ways the Company would "optimize value" would be to "focus on execution, product innovation, network optimization, and to ***promote operational and financial discipline*** throughout the organization."

126.    Defendant Braunstein also explained that, after the departure of Defendant Frank, the Company would be searching for a "strong leader" and had "retained Korn Ferry to conduct a comprehensive search for a successor."

127.    Moreover, Defendant Braunstein admitted that Talkspace was suffering from issues with retention: "We must also ***improve conversion rates and increase retention*** through improved

customer experiences. Efforts in the planning process of the company must be prioritized and executed on these issues going forward." He later stated Talkspace intended to "prioritize products and services that [the Company] expect[ed] will lead to higher customer engagement, **better retention**, and increased lifetime value and focus on efforts to increase conversion rates."

128. Defendant Braunstein acknowledged that "the overall financial results for the third quarter came in below expectations management shared with investors on our last earnings call. We are obviously disappointed by this performance and we have to do better." He explained that he "expect[ed the] management team to work with [him] with an increased emphasis on execution, prioritization and a ***more disciplined approach to capital allocation*** going forward."

129. One of the solutions Defendant Braunstein described was "to . . . ***simplify[] the process to submit claims for all of [Talkspace's] members***."

130. Defendant Braunstein also explained that Talkspace's "technology team [was] working to ***simplify the session submission process and automate billing for our insurance clients***. These changes can minimize the administrative burden for our clinicians while simultaneously improving the collection rates of our receivables."

131. In her prepared remarks, Fulk reiterated that:

> net revenue for the third quarter was $26.4 million a 23% year-over-year increase[, which] came in below our expectations as a result of a lower number of acquired customers during the quarter in our direct-to-consumer business and an adjustment to our reserves for credit losses related to receivables from Health Plan Clients, which was only partially offset by growth in B2B gross revenue.

132. Fulk noted that "the slowdown in [Talkspace's] B2C business resulted from delays in launching new products, features and markets ***as well as a decline in our conversion rates***."

133. Regarding the adjustment Talkspace had been forced to make, Fulk explained that the Company had to "increase[] the allowance for credit losses on receivables by $3.4 million ***of***

*which $2.8 million related to prior quarters*.  Claims processing has so far been a ***highly manual and complex process***.  Improvements in this operational capability are a high priority and critical as we scale the business for B2B revenue."

134.    Fulk also stated that Talkspace covered over 75 million eligible lives, but for the first time, admitted "that because individuals can be covered by multiple programs, for example, health insurance and EAP this aggregate number may include a certain degree of overlap for individual members."  Fulk tried to minimize the surprise of this new disclosure that Talkspace had been overstating one of its key business metrics, stating that the Company's "definitions have remained consistent and so it provides a helpful barometer of our growth in eligible members."

135.    Talkspace had also restated the number of eligible lives that had been previously reported as of June 30, 2021, from approximately 56 million to almost 72 million, after updates from payers.

136.    Charles Rhyee, a Cowen analyst, immediately asked about Talkspace's sudden about-face:

> I guess maybe just want to unpack some of the things you guys talked about here, particularly about conversion rates.  ***Maybe you can go into [that] a little bit more and try to understand because, the sense that I got, earlier in prior, discussions in quarters, was that you guys did have strong, good member experience, good conversion, you're talking about growth in B2B.  Maybe help understand what you're talking about specifically here?***  What were you seeing in terms of—maybe explain a little bit more what do you mean by conversion rates and what are we seeing here and what trends do you feel that you need to reverse?

137.    In response, Fulk explained that the ***conversion rate*** was "the largest factor . . . when it comes to kind of our performance in B2C in the third quarter."

138.    Defendant Braunstein also stated: "The board and the management team, I think collectively have an extraordinarily strong sense of urgency that we need to address these issues

both as quickly as we can, but ultimately as efficiently as we can and make sure that we're *implementing systems* that do the job that we hope that they will do."

139.    In response to a question about what qualities Talkspace sought in a new CEO, Defendant Braunstein remarked that Talkspace "did not get started as a public company in the manner that we had hoped for, and obviously we're disappointed by that[,]" and revealed for the first time that the "***Board ha[d] been working together with the management really over the past five months*** and we've had actually ***numerous conversations regarding management and management succession***."

140.    Daniel Grosslight, an analyst from Citi, sought more color on the accounts receivables charge, in response to which Defendant Braunstein admitted that Talkspace had not yet adequately scaled its claims processing capabilities, nor implemented appropriate or adequate internal controls to avoid such a write-down:

> We know as we grow this business, we clearly have a need to scale this capability appropriately.  Regarding the reserve in Q3, we mentioned—I mentioned earlier that $2.8 million of the $3.4 million was related to prior periods and we feel that that is an appropriate amount to address those claims that we're unlikely to collect from those prior periods.  ***At this point we've implemented processes to make sure that the reserve that we have both for Q3 and for future periods is also appropriate.***

141.    Subsequent to, and due to, the closing of the Merger, the price of Talkspace common stock declined precipitously as the truth about Talkspace and the Proxy's false and misleading nature were revealed over time.  By December 30, 2021, the price of Talkspace common stock was trading below $2 per share, 80% below the price shareholders would have received if they had redeemed their shares instead of approving the Merger less than one year earlier.

142.    Following the November 15, 2021 conference call, analysts at Citi, SVB Leerink,

Jefferies, and Baird all downgraded the stock or initiated Talkspace as a Hold/Sell.

143.    Citi analyst Daniel Grosslight wrote: "While the issues this quarter were easily diagnosed (retention issues, product delays, billing difficulties, low utilization rates, high provider/marketing expense), we do not think they will be easily remedied."

144.    Just a week later, on November 22, 2021, the Company announced that Defendant Hirschhorn would resign, effective immediately, following an internal review of unspecified misconduct the prior week.

145.    Then, on December 21, 2021, the Company again restated its eligible lives number based on information from a large health plan, from 71.9 million to 55.0 million eligible lives as of June 30, 2021 (representing 64% growth year-over-year), and from 75.3 million to 56.6 million eligible lives as of September 30, 2021 (representing 44% growth year-over-year). The previous metrics had included lives "that the health plan subsequently determined were not yet eligible to use the Company's services."

146.    On January 12, 2022, Talkspace announced its revenue results for the fourth quarter of 2021, missing analyst estimates. SVB Leerink later noted on January 12, 2022 that the Talkspace's B2B Eligible Lives figure missed its prior estimates, and noted that they "view[ed] the ~6k sequential step down in B2B eligible lives as more concerning given the level of investor focus on the [B2C] to B2B transition." This represented the "first sequential net decline in the metric, reflecting greater than expected levels of attrition in the B2B business."

147.    On February 22, 2022, Talkspace announced revenue growth, "***driven by continued strong B2B performance***."

## V.    DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT

### A.    Misstatements and Omissions Concerning Conversion and Matching Algorithm

148.    During the J.P. Morgan Health Care Conference, held on January 13, 2021, and filed pursuant to Rule 425 on January 14, 2021, Defendant Braunstein stated that Talkspace retained its users longer than traditional therapy: "[T]he convenience of talking to your provider—any media, any time, 5 days a week—is generating very high levels of engagement.  We generate far longer tenure which is needed for clinical outcomes."  Defendant Frank connected this longer tenure to better outcomes:

> You need between 2-3 months of therapy in order to show some kind of progress or remission. And therefore, if the average is two sessions, most people are just wasting their time.  **With Talkspace, we are scoring well over 5 months of tenure for our people that are our members.**  So we exceed the 3 months that is needed for basic remission **very easily, and we generate very high level of engagement.**

149.    Defendant Frank explained that Talkspace's retention of its patients resulted in better outcomes:

> A typical or an average B2C user of Talkspace will stay on the platform for over five months, so dramatically longer than what the traditional modality offers and therefore, this tenure allows us to get the treatment going for long enough with the right therapist or psychiatrist match[ed] to that patient in order to show very strong clinical outcomes . . . .

150.    Defendant Frank continued to discuss the outcomes of using the Talkspace platform, including that while patients visiting a therapist face-to-face would spend "just a couple of weeks, or sessions, in therapy[, o]n the Talkspace platform, [they] will spend way over five months, which allows us to convert this into far superior clinical outcomes."

151.    On January 13, 2021, Talkspace filed a press release titled, "Talkspace to Merge with Hudson Executive Investment Corp., Forming the Only Publicly Traded Pure Play Virtual

Behavioral Health Company," as an exhibit to the Company's Form 8-K.

152.    The press release stated, in relevant part, that:

> Talkspace promotes behavioral health as a lifestyle, ***not as a one-time event***.  The company provides access to an extensive network of certified, credentialed, and professional clinicians through two channels—direct-to-consumer and enterprise—and has ***leading brand awareness*** in digital behavioral health.

153.    Talkspace and Hudson Executive Capital held a conference call to announce the Merger on January 13, 2021; Talkspace filed a transcript of that call with the SEC the next day, January 14, 2021, pursuant to Rule 425.

154.    Defendant Braunstein noted on that call that Talkspace's proprietary algorithm would instantly match users to therapists: "With us, it is 2 minutes for first contact and ***almost 100% rate of matching in the same day***—typically between 3 and 4 hours. ***So you can start your treatment immediately—no wait time.***"

155.    Defendant Frank also touted on that call that Talkspace continued to be able to provide a same-day match due to its technology:

> [T]his digital control or management system allows us to predict and load-balance demand versus supply and we believe that this has been shown through COVID, where Talkspace has essentially doubled the number of its members, and ***still we maintain our SLA of providing a match in the very same day for everyone that wishes*** so.  This capacity is, I would say, ***driven by our technology platform*** that allows us to learn from previous utilization and informs the size of panels, how many therapists in which states with which, I would say, credentials are needed to supply the demand, and we are being able to do that on the same-day basis ever since.

156.    The foregoing statements in ¶¶ 148-55 were each materially false and misleading when made because the Company failed to disclose that, *inter alia*, users were having issues matching with providers or would not use the algorithm at all, which was leading to lower conversion and retention.  Moreover, many users would not be matched with a provider in the

same day, and those who did receive a match.

157.    For example, while Defendant Braunstein touted that the Company's long tenure metrics would "***generate a very high level of engagement***" (¶ 148), and that such tenure allowed Talkspace to have "very strong" or "far superior" (¶¶ 149-50), Defendants failed to disclose that Talkspace was having issues retaining customers.

158.    Defendants stated that they had "almost 100% rate of matching in the same day," (¶¶ 154-55), but failed to disclose that not all users actually used Talkspace's matching algorithm, which negatively impacted Talkspace's conversion rates.

**B.      Misstatements and Omissions Regarding Scalability and Automated Claims Processing**

159.    During the January 13, 2021 conference call to announce the Merger, Defendant Braunstein emphasized Talkspace's "***scalable platform*** that will yield free cash flow over time," and Frank agreed, later on that call, that Talkspace operated on a "very large scale."

160.    Further, regarding Talkspace's technology, Defendant Frank told investors to remember that "Talkspace is essentially a technology company. . . .  Most of our employees are actually software engineers and we go to market and solve both clinical [] access and business issues ***through the use of code***."

161.    He later stated on that call that technology was a part of ***each*** step of a patient's experience, explaining that, "regarding [Talkspace's] technology platform, that we have included ***technology as part of our platform with every stage of treatment***."

162.    Defendant Hirschhorn also noted during the call that Talkspace had "been ***successfully scaling the business through unprecedented peak demand months*** during 2020, and we expect[ed] that our investments and resulting education through this challenging period set us up for further growth and operational excellence in 2021."

163.    In a Rule 425 filing with the SEC on June 9, 2021, Defendant Frank stated that Talkspace's "purpose-built platform is designed to personalize treatment and improve clinical outcomes *at scale*[.]"   He continued: "With its robust network of credentialed health care professionals addressing a wide spectrum of acuities, *its scalable technology platform and unique data set*, we believe that Talkspace is ideally positioned to address the vast, unmet and growing demand for mental health services in innovative ways."

164.    The Q2 2021 10-Q contained the following statement, explaining that one of the benefits to providers was that it "reduced administrative burdens":

> While optimizing consumers' access to care, we believe our platform also provides benefits to providers through expanded reach, steady access to member leads, *reduced administrative burdens*, more efficient time utilization and data-driven insights. These features, together with continuous training and professional growth opportunities we offer, empower providers to deliver what we believe will enable an enhanced care journey, higher member lifetime engagement, meaningful outcomes and greater margins when compared to face-to-face treatment.

165.    The foregoing statements in ¶¶ 159-64 were materially false and misleading when made, because, *inter alia*, as revealed on November 15, 2021, the Company did not have an automated process to submit and bill claims to insurance, thereby acutely increasing the likelihood that insurers would not reimburse the Company for those claims, as eventually occurred.

166.    Defendants touted that Talkspace's platform was designed to work "at scale" and was "scalable," and that issues would be solved with "code," as "technology" was a part of every stage of treatment (¶¶ 159-61, 163), but failed to disclose that at that time, Talkspace did not even have an automated billing system.   Indeed, Talkspace told its investors that it was "successfully scaling" (¶ 162) through peak demand and had a "scalable technology platform" (¶ 163), but failed to disclose that this scaling did not incorporate claims processing, which was not automated. Indeed, Talkspace had not "reduced the administrative burdens" associated with claims processing,

which was still—as was later revealed—a "*highly manual and complex process*."

### C.    Misstatements and Omissions Regarding B2B Eligible Lives

167.    Regarding Talkspace's key business metric, "B2B Eligible Lives," the Q2 2021

10-Q stated that Talkspace had "approximately 56 million B2B eligible lives," and explained the

metric as follows:

> We consider B2B lives "eligible" if such persons are eligible to
> receive treatment on the Talkspace platform, in the case of our
> enterprise clients, for free when their employer is under an active
> contract with Talkspace, or, in the case of health plan clients, at an
> agreed upon reimbursement rate through insurance under an
> employee assistance program or other network behavioral health
> paid benefit program.

168.    Talkspace's January 13, 2021 press release also stated, in relevant part, that:

> Talkspace has seen robust user growth, with approximately 46,000
> active members, and *more than 39 million lives covered by
> employer or healthcare insurance agreements*.  The company is
> differentiated in the market due to its focused offerings as well as its
> highly-rated app and purpose-built technology designed to enhance
> access and improve outcomes.

169.    The foregoing statements in ¶¶ 167-68 were false and misleading when made

because it failed to disclose, as was later revealed, that this key metric involved double-counting

if users were covered by more than one plan, and was therefore artificially inflated.

### D.    Misstatements and Omissions Regarding the Strength of Talkspace's Management

170.    During a conference call in January 2021, Defendant Braunstein stated, "we think

we are partnering with a truly wonderful management team.  They are leaders in the field.  They

are innovators.  They have deep experience and we believe our partnership with the executives at

Hudson create a 1+1=3 opportunity for investors."

171.    Defendant Braunstein told Bloomberg TV on January 14, 2021 that the "first" thing

that differentiated Talkspace from other targets "was the personal chemistry between Oren and

Roni and Mark and the management team, and our executives. . . . [Y]ou need to be partnered with people you feel have a similar mission and a similar vision for how the business is going to grow."

172.    Defendant Frank further emphasized the importance of the management team during the January 13, 2021 call announcing the Merger:

> Every business is a people's business, but, of course, a company that wants to democratize behavioral health services, ***it's all about the people even more than ever before, and you will see a very strong team, I would say, very much aligned***, around our mission to open up access to care, and deliver strong clinical outcomes, with very diverse backgrounds and experiences, which is essential to generating the level of innovation and disruption that we need to deliver in order to dramatically improve, I would say, both the efficacy and the efficiency of the behavioral health delivery system.

173.    In an internal letter published pursuant to Rule 425 on January 15, 2021, Defendant Frank assured Talkspace employees that after the Merger, he and his wife, Roni Frank, would "stay in [their] jobs."

174.    The foregoing statements in ¶¶ 170-73 were materially false and misleading when made, because, *inter alia*, as revealed on November 15, 2021, the Company did not have confidence in its current management team and was discussing management succession plans as early as the filing of the Proxy.

### E.    Misstatements and Omissions Regarding Internal Controls

175.    In response to the massive accounting scandals at Enron, WorldCom, Global Crossing, and Tyco, Congress enacted sweeping reforms to restore integrity to the financial markets and regain investors' trust and confidence in those markets.  Many such reforms were included in the Sarbanes-Oxley Act of 2002 ("SOX") in an effort to prevent the abusive practices that had caused billions of dollars of losses to investors in public companies from recurring.  One of the cornerstones of these reforms was the requirement that companies set up a sound financial

accounting system that would generate reliable, verifiable financial reports. One of the key features of this requirement is that the company's principal officers—typically, the CEO and the CFO—must certify in writing that they have undertaken a sufficient investigation to confirm that the company has indeed established the requisite financial accounting system, that it has produced accurate financial statements that fully and fairly identify the company's financial position, and that the company's system of internal disclosure controls and procedures are effective and capable of raising any red flags and providing the signing officers with all the material information they need to know about the company's true financial condition.

176.    Accordingly, when a CEO and CFO sign a SOX-required certification attesting that the company's internal control function over its financial reporting is effective, and that the financial statements produced by the company's accounting system are reliable and verifiable in presenting the company's true financial condition, they are implementing that crucial step of the congressional reforms designed to restore confidence in capital markets and in individual companies' earnings reports. This is not a mere rote exercise by which corporate officers can dodge their grave responsibilities by simply checking a box and signing on the dotted line to rubber-stamp compliance; on the contrary, Congress and the capital markets fully expect that senior management has discharged their highly critical duty by actively confirming the company's disclosure and financial controls. In addition, by his or her signature, the certifying officer is broadcasting to investors that it has disclosed any fraud or is not aware of any fraud. Investors rely on the accuracy and transparency of these disclosures when determining whether to invest.

177.    Defendants repeatedly certified that they had established effective internal controls over Talkspace's financial reporting as well as effective disclosure controls and procedures for Talkspace.

43

178.    The Q2 2020 10-Q, filed August 14, 2020, stated that Talkspace's "Chief Executive Officer and Chief Financial Officer concluded that [its] disclosure controls and procedures (as defined in Rules 13a-15 (e) and 15d-15 (e) under the Exchange Act) were effective."

179.    Defendants Bergeron and Dobres certified that the Q2 2020 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

180.    The 3Q 2020 10-Q stated that Talkspace's "Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of September 30, 2020 . . . [and] concluded that our disclosure controls and procedures (as defined in Rules 13a-15 (e) and 15d-15 (e) under the Exchange Act) were effective."

181.    Defendants Bergeron and Dobres certified that the 3Q 2020 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

182.    The 2020 10-K, filed March 29, 2021, stated that Talkspace's "management evaluated, with the participation of our current chief executive officer and chief financial officer . . . the effectiveness of our disclosure controls and procedures as of December 31, 2020, pursuant to Rule 13a-15(b) under the Exchange Act. Based upon that evaluation, our Certifying Officers concluded that, as of December 31, 2020, our disclosure controls and procedures were effective."

183.    Defendants Bergeron and Dobres certified that the 2020 10-K did "not contain any

untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

184.    The amended Form 10-K for the full year ended December 31, 2020 (the "2020 10-K/A") filed May 5, 2021, restated the Company's financial statements as of December 31, 2020 and from February 6, 2020 through December 31, 2020, and financial data as of June 11, 2020, and identified certain issues with the Company's internal controls, as to the classification of the Company's warrants and a forward purchase agreement as equity rather than liabilities, and related financial disclosures.  The amended annual report explained:

> In connection with the restatement, the Company's management reassessed the effectiveness of its disclosure controls and procedures for the periods affected by the restatement.  As a result of that reassessment, the Company's management determined that its disclosure controls and procedures for such periods were not effective with respect to the classification of the Company's warrants and the HEC Forward Purchase Agreement as components of equity instead of as liabilities, as well as the related determination of the fair value of warrant liabilities, additional paid-in capital and accumulated deficit, and related financial disclosures, and that the foregoing arose as a result of a material weakness in the Company's internal control over financial reporting.

185.    Defendants Bergeron and Dobres filed new certifications, and certified that the 2020 10-K/A did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

186.    The first quarterly filing after the restatement, the Q1 2021 10-Q, filed May 18, 2021, stated that Talkspace's CEO and CFO had evaluated "the effectiveness of the design and operation of [Talkspace's] disclosure controls and procedures as of March 31, 2021":

> Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of the design and operation of our

disclosure controls and procedures as of March 31, 2021.  Based upon their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, solely due to the Company's restatement of its financial statements to reclassify the Company's warrants and the HEC Forward Purchase Agreement as described in the Company Amended Annual Report on Form 10-K/A, our disclosure controls and procedures (as defined in Rules 13a-15 (e) and 15d-15 (e) under the Exchange Act) were not effective, and the foregoing arose as a result of a material weakness in the Company's internal control over financial reporting.  In light of this material weakness, we performed additional analysis as deemed necessary to ensure our financial statements were prepared in accordance with U.S. generally accepted accounting principles.  Accordingly, management believes the financial statements included in this report present fairly in all material respects our financial position, results of operations and cash flows for the periods presented.

187.    Defendants Bergeron and Dobres certified that the Q1 2021 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

188.    The Q2 2021 10-Q stated that following the identification of this material weakness, Talkspace had "performed additional analysis as deemed necessary to ensure that [its] financial statements were prepared in accordance with U.S. generally accepted accounting principles. Accordingly, management believes that the financial statements included in this Form 10-Q present fairly in all material respects our financial position, results of operations and cash flows for the periods presented."

189.    Fulk and Defendant Frank certified that the Q2 2021 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

190.    The foregoing statements in ¶¶ 175-89 regarding internal controls were false or

misleading when made, for among other reasons, because, while in addition to the weaknesses the Company identified, Talkspace did not have effective disclosure controls and procedures over its financial disclosures and/or its claims processing. The Company lacked customer relationship management systems, and, as the Company admitted, claims processing had "been a highly manual and complex process."

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

191.   Because of its automated platform, Talkspace had robust data tracking abilities, and was able to review information about metrics such as outcomes, retention, engagement, and treatment tenure.

192.   Indeed, during the November 15, 2021 earnings call, Defendant Braunstein emphasized that "factors [such as investing in new products, whether it's in improving our conversion rate, whether it's improving our retention], *those execution factors are completely within the management's control*." Defendant Braunstein later concluded: "[T]he good news for the company . . . is that much, if not all of that is *within our control*."

193.   Moreover, Defendants Frank and Braunstein were married to individuals who could have provided information to Defendants about the issues at the Company. Defendant Frank is married to Roni Frank, who was Head of Clinical Services and a Board member despite never having been a clinician herself. Defendant Braunstein is married to Samara H. Braunstein, who served as Talkspace's Chief Marketing Officer since December 2020.

194.   As Defendant Hirschhorn said during an interview conducted on May 23, 2022, "[o]ne [married couple] was replaced by another couple, but you never want to work under those conditions."

195.   According to the Proxy, Talkspace's "proprietary matching algorithm and machine-

learning tools **provide real-time engagement insights**, inform treatment and track clinical progress." Indeed, analysts from William Blair noted that Talkspace was "unique" in its "robust analytics around CAC[.]"

196.    Moreover, Defendant Hirschhorn stated on August 10, 2021, that Talkspace had been "been tracking [CAC] clearly over the last five years."

197.    **The SPAC structure further supports a strong inference of scienter.** As of the filing of the Proxy, the Sponsor held 10,300,000 Founder shares, and Defendants Duggin and Schulman each held 50,000 founder shares. Braunstein and Bergeron may have had an interest in the Sponsor's founder shares based on their membership interests in the Sponsor.

198.    Pursuant to an agreement, 70% of the Sponsor's founder shares would vest at the closing of the Merger. However, the remaining 30% of the founder shares would not vest unless, within 5 years of the closing of the Merger, the price of Talkspace's common stock reached $12.00 (15%), and $15.00 (15%).

199.    Therefore, the Sponsor, Duggin, and Schulman had the motivation to mislead (and cause others to mislead) about the potential of Talkspace. Had Talkspace's stock price met the founder stock sale restriction, the Sponsor, Duggin, and Schulman had the opportunity to unlawfully profit on their investments.

200.    **Core operations.** The core operations doctrine, which is evidence that bolsters the strength of the inference of scienter, is the theory that "when contradictory facts of critical importance to the company either were apparent or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company." *Wallace v. IntraLinks*, 2013 WL 1907685, at *8 (S.D.N.Y. May 8, 2013). Here, in addition to other facts discussed herein, Defendants' knowledge can be inferred because

Talkspace, a company of just 457 employees after the close of the Merger, provided a single product and generated revenue through just two channels: B2B and B2C.  It is likely that Defendants would remain apprised of the development of, and differences between, the two channels through which they provided their platform to customers.  Given the importance of these channels to the Company's financial performance, there is no doubt that the Defendants would have been aware of the issues described above.

201.    Moreover, Defendants had a live dashboard to measure matching rates in real-time.

## VII.    DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS IN VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT

202.    On February 2, 2021, HEIC filed the registration statement and draft proxy for the Merger on Form S-4 with the SEC, which after several amendments, was incorporated into a final prospectus and proxy statement filed with the SEC, and declared effective, on May 28, 2021 (previously defined as the "Proxy").  Defendants Braunstein, Bergeron, Dobres, Greifeld, Schulman, and Duggin signed the Proxy; the Proxy included information about Talkspace provided by defendants Frank and Hirschhorn; and the Blank Check Defendants reviewed, prepared, and had ultimate authority over the contents of the Proxy.

203.    The Proxy stated that the Board recommended that shareholders vote to approve the Merger at the special meeting of shareholders scheduled for June 17, 2021.  The Proxy stated:

"***After careful consideration, the [HEIC] Board has determined that the [Merger and its related shareholder proposals] are fair to and in the best interests of [HEIC] and its stockholders and unanimously recommends that you vote or give instruction to vote 'FOR'***" each of the proposals.

204.    The Proxy added:

> The [HEIC] Board considered the results of the due diligence review of Talkspace's business.  The [HEIC] Board also considered Talkspace's current prospects for growth.  For additional information, see "*Proposal No. 1—The Business Combination Proposal—[HEIC's] Board of Directors' Reasons for Approval of*

49

*the Transactions*."

> *As a result, [HEIC] believes that a business combination with Talkspace will provide [HEIC] stockholders with an opportunity to participate in the ownership of a company with significant growth potential.*  Please see the section entitled "*Proposal No. 1—The Business Combination Proposal—[HEIC's] Board of Directors' Reasons for Approval of the Transactions.*"

205.    In the section entitled "*Proposal No. 1—The Business Combination Proposal—[HEIC's] Board of Directors' Reasons for Approval of the Transactions*," the Proxy explained the Board's rationale for recommending the Merger, noting among other reasons:

> •    ***Attractive Valuation.***    As more fully described under "Comparable Company Analysis," the purchase price values Talkspace at a discount to selected comparable companies with respect to Talkspace's pro forma implied estimated revenue (for 2021E and 2022E), estimated gross profit (for 2021E and 2022E), actual revenue and estimated revenue compound annual growth rate (from 2019A through 2023E).
>
> •    ***Reasonableness of Aggregate Consideration***.  Following a review of the financial data provided to [HEIC], including Talkspace's historical financial statements and certain unaudited prospective financial information, as well as [HEIC's] due diligence review of the Talkspace business and the views of [HEIC's] financial and other advisors, ***the [HEIC] Board considered the aggregate consideration to be paid and determined that the aggregate consideration was reasonable in light of such data and financial information***.
> ***Business and Financial Condition and Prospects***.  ***After conducting extensive due diligence, along with their familiarity with Talkspace's business from prior commercial experiences, the [HEIC] Board and [HEIC] management had knowledge of, and were familiar with, Talkspace's business, financial condition, results of operations and future growth prospects***.  The [HEIC] Board considered the results of the due diligence review of Talkspace's business, including its comprehensive and diverse data, intellectual property and network assets, its payor customers, its ability to enhance, extend and expand its platform, the potential impact of COVID-19 on its business, as well as the legal due diligence performed by Milbank LLP, the quality of earnings prepared by KPMG LLP and the financial due diligence conducted by [HEIC's] management.

\*    \*    \*

***Talkspace's Growing Customer Base.***   [HEIC] and Talkspace forecasted that the number of total business to customer subscribers will increase from 19,851 in 2019, to 31,214 in 2020, 46,259 in 2021, 71,001 in 2022 and 85,829 in 2023.  [HEIC] and Talkspace additionally forecasted that the number of total business to business eligible lives will increase from 6,725,000 in 2019, to 39,285,000 in 2020, 65,341,000 in 2021, 129,093,000 in 2022 and 174,218,000 in 2023.

\*    \*    \*

***Talkspace Being an Attractive Target.***   The [HEIC] Board considered the fact that Talkspace (i) is of a size relevant to the public marketplace, (ii) has a strong existing management team, (iii) ***has a significant total addressable market and growth expansion opportunities***, (iv) provides an opportunity for operational improvement and (v) would benefit from the consummation of the Transactions as a result of becoming a public company and de-leveraging, which the [HEIC] Board believed would improve Talkspace's ability to grow, including through acquisitions.

206.    The Proxy also stated that HEIC's Board relied on the following forecasted financial information for Talkspace, which was provided to HEIC by Talkspace management, and was reiterated in the Proxy to shareholders:

| *(in millions, except active members and percentages)* | Calendar Year Ending December 31, 2020E | Calendar Year Ending December 31, 2021E | Calendar Year Ending December 31, 2022E | Calendar Year Ending December 31, 2023E |
|---|---|---|---|---|
| **Total business to consumer active members** | 31,214 | 46,259 | 71,001 | 85,829 |
| **Total business to business eligible lives (in thousands)** | 39,285 | 65,341 | 129,093 | 174,218 |
| **Net revenue** | $ 74 | $ 125 | $ 205 | $ 285 |
| **Percentage growth** | 94% | 69% | 64% | 39% |
| **Gross profit** | $ 47 | $ 80 | $ 129 | $ 176 |
| **Percentage margin** | 63% | 64% | 63% | 62% |
| **Operating expenses** | $ (62) | $ (93) | $ (114) | $ (134) |
| **EBITDA (1)** | $ (15) | $ (12) | $ 14 | $ 42 |

207.    The statements in ¶¶ 203-06 were materially false and misleading when made because HEIC had overstated its competitive advantage and due diligence capabilities with respect to identifying and effectuating a merger with target companies, and HEIC had conducted inadequate due diligence into then-private Legacy Talkspace, or else ignored and/or failed to

disclose multiple red flags concerning then-private, pre-Merger Talkspace's business and operations.

208.    The Proxy additionally included generic risk statements about the Company's ability to attract new B2C customers and the related advertising expenses.  For example, in the Proxy's "Risk Factors" disclosures, the Proxy stated:

> **Our business and the markets we operate in are new and rapidly evolving, which makes it difficult to evaluate our future prospects and the risks and challenges we may encounter.**
>
> These risks and challenges include our ability to:
>
> - **attract new clients and members to our platform and position our platform as a convenient and accepted way to access therapy and psychiatry;**
>
>           \*        \*        \*
>
> - **attract new and existing clients and members to rapidly adopt new offerings on our platform; [and]**
>
>           \*        \*        \*
>
> - **effectively manage our growth and business operations.**

209.    As an additional "Risk Factor," regarding its marketing efforts, the Proxy disclosed:

> **Our future growth and profitability of our business will depend in large part upon the effectiveness and efficiency of our marketing efforts, and our ability to develop brand awareness cost-effectively.**
>
> **Our business success depends on our ability to attract and retain clients and members, which significantly depends on our marketing practices.  Our future growth and profitability will depend in large part upon the effectiveness and efficiency of our marketing efforts, including our ability to**:
>
> - create greater awareness of our brand;
> - identify the most effective and efficient levels of spending in each market, media and specific media vehicle;
> - determine the appropriate creative messages and media mix for advertising, marketing and promotional expenditures;
> - effectively manage marketing costs (including creative and media) to maintain acceptable consumer acquisition costs;
> - select the most effective markets, media and specific media

vehicles in which to advertise; and

- convert consumer inquiries into clients and members.

*We believe that developing and maintaining widespread awareness of our brand in a cost-effective manner is critical to achieving widespread adoption of our solution and attracting new clients and members. Our brand promotion activities may not generate consumer awareness or increase revenue, and even if they do, any increase in revenue may not offset the expenses we incur in building our brand. If we fail to successfully promote and maintain our brand, or incur substantial expenses in doing so, we may fail to attract or retain clients and members necessary to realize a sufficient return on our brand-building efforts or to achieve the widespread brand awareness that is critical for broad adoption of our brands.*

210.    Further, the Proxy included as a "Risk Factor" the following risk about retention:

*Our business and the markets we operate in are new and rapidly evolving, which makes it difficult to evaluate our future prospects and the risks and challenges we may encounter.*

Our business and the markets we operate in are new and rapidly evolving which make it difficult to evaluate and assess the success of our business to date, our future prospects and the risks and challenges that we may encounter. These risks and challenges include our ability to:

- attract new clients and members to our platform and position our platform as a convenient and accepted way to access therapy and psychiatry;
- retain our clients and members and encourage them to continue to utilize our platform and services;
- attract new and existing clients and members to rapidly adopt new offerings on our platform;
- increase the number of clients and members that use our subscription offerings or the number of subscription programs that we manage;
- retain our clients and members that subscribe to our subscription offerings[.]

211.    The Proxy also included the following "Risk Factor" regarding Talkspace's growth:

*We may not grow at the rates we historically have achieved or at all, even if our key metrics may indicate growth, which could have*

*a material adverse effect on the market price of our common stock.*

We have experienced significant growth in the last several years, and therefore our recent revenue growth rate and financial performance should not be considered indicative of our future performance. For the year ended December 31, 2019 and 2020, our revenue was $38.2 million and $76.2 million, respectively, representing a 99.6% growth rate, and for the three months ended March 31, 2021 and 2020, our revenue was $27.2 million and $11.1 million, respectively, representing a 144.2% growth rate. In addition, with the COVID-19 pandemic, we have experienced a significant increase in revenue. The circumstances that have accelerated the growth of our business stemming from the effects of the COVID-19 pandemic may not continue in the future, and future revenues may not grow at these same rates or may decline. You should not rely on our revenue or key business metrics for any previous quarterly or annual period as any indication of our revenue, revenue growth, key business metrics, or key business metrics growth in future periods. In particular, our revenue growth rate has fluctuated in prior periods. Our future growth will depend, in part, on our ability to grow our revenue from existing clients and members, to acquire potential future clients and members, to expand our client, member and provider bases, to develop new products and services and to expand internationally. ***We can provide no assurances that we will be successful in executing on these growth strategies or that, even if our key metrics would indicate future growth, we will continue to grow our revenue or to generate net income. Our ability to execute on our existing sales pipeline, create additional sales pipelines, and expand our client and member bases depends on, among other things, the attractiveness of our services relative to those offered by our competitors, our ability to demonstrate the value of our existing and future services, and our ability to attract and retain a sufficient number of qualified sales and marketing leadership and support personnel.*** In addition, our existing clients and members may be slower to adopt our services than we currently anticipate, which could adversely affect our results of operations and growth prospects.

212.    The Proxy also touted Talkspace's matching algorithm, which would quickly match

a user to a provider. For example, the Proxy stated, as follows:

•    *Integrated technology platform*: Our proprietary matching algorithm and machine-learning tools provide real-time engagement insights, inform treatment and track clinical progress.

\*        \*        \*

- We then leverage our proprietary algorithm to match members and providers, allowing for an optimized start of the relationship, which we believe is a key factor in delivering care continuity.

*     *     *

- Matching algorithm: We utilize machine learning to predict a provider's efficacy at onboarding. Our matching algorithm combines information from both structured and unstructured sources to predict which therapists have the greatest chance of success with each patient. Our matching model concurrently gathers client and therapist data and screens the therapists' population to match the patient's characteristics, clinical needs and preferences. Our machine learning technology also enables us to track the frequency and quality of clinical interactions, allowing us to provide a better therapist match should the patient request a new clinician.

213. The statements in ¶¶ 208-12 were materially false and misleading when made because they failed to disclose that users had issues matching with providers and, in part due to these matching issues, Talkspace was experiencing significantly increased online advertising costs in the B2C business since the beginning of 2021, as well as lower conversion rates from its online advertising in its B2C business, and, as a result, Talkspace was experiencing more tepid B2C demand than represented to investors, leading to ballooning customer acquisition costs and worsening growth and gross margin trends.

214. The disclosure in ¶ 208 was also materially false and misleading when made because although Talkspace said that one of the "risks and challenges" would be its ability to "effectively manage [the Company's] growth and business operations[,]" the Company failed to disclose that Defendant Frank was focused on the B2C channel rather than B2B, the Company had no customer relationship management systems in place, and was manually billing its clients.

215. The risk factor discussion in ¶ 210 was also materially false and misleading when made because Talkspace failed to disclose that it was already lacking the systems in place that

55

would allow it to attract and retain members.

216.    The risk factor discussion in ¶ 211 was also materially false and misleading when made because while noting that the Company could not provide any "assurances" of success "even if key metrics would indicated future growth," Talkspace failed to disclose that one of its key metrics, "B2B Eligible Lives," involved double counting.

217.    The Proxy also discussed the risk of the loss of an executive officer or key employee:

> ***We depend on our senior management team, and the loss of one or more of our executive officers or key employees or an inability to attract and retain highly skilled, very large and diverse employees could adversely affect our business.***
>
> Our success depends largely upon the continued services of our key members of senior management.    These members of senior management are at-will employees and therefore they may terminate employment with us at any time with no advance notice.    We also rely on our leadership team in the areas of research and development, marketing, services and general and administrative functions.    ***From time to time, there may be changes in our management team resulting from the hiring or departure of executives, which could disrupt our business.***    The replacement of one or more of our executive officers or other key employees would likely involve significant time and costs and may significantly delay or prevent the achievement of our business objectives.    Our business would also be adversely affected if we fail to adequately plan for succession of our executives and senior management; or if we fail to effectively recruit, integrate, retain and develop key talent and/or align our talent with our business needs, in light of the current rapidly changing environment. ***While we have succession plans in place and we have employment arrangements with a limited number of key executives, these do not guarantee that the services of these or suitable successor executives will continue to be available to us.***

218.    A similar risk disclosure stated:

> Our ability to successfully effect the business combination and to be successful thereafter will be dependent upon the efforts of certain key personnel, ***including the key personnel of Talkspace whom we expect to stay with the post-combination business following the***

56

***business combination.*** The loss of key personnel could negatively impact the operations and profitability of our post-combination business and its financial condition could suffer as a result. Our ability to successfully effect the business combination is dependent upon the efforts of our key personnel, including the key personnel of Talkspace. ***Although some key personnel may remain with the post-combination business in senior management or advisory positions following the business combination, it is possible that we will lose some key personnel, the loss of which could negatively impact the operations and profitability of our post combination business.*** We anticipate that some or all of the management of Talkspace will remain in place. Talkspace's success depends to a significant degree upon the continued contributions of senior management, certain of whom would be difficult to replace. ***Departure by certain of Talkspace's officers could have a material adverse effect on Talkspace's business, financial condition, or operating results.***

219. The statements in ¶¶ 217-18 were materially false and misleading when made because Talkspace omitted that the Company already did not have confidence in its current management team and was discussing management succession plans at the time of the filing of the Proxy.

220. Having disclosed that the Company had identified a material weakness in its internal control over financial reporting, the Proxy warned of the following:

> We intend to take certain remedial actions intended to address the identified material weakness in our internal control over financial reporting. However, we can give no assurance that such measures will remediate the material weakness identified or that any additional material weaknesses or restatements of financial results will not arise in the future. ***In the future, our management may determine that our disclosure controls and procedures are ineffective or that there are one or more material weaknesses in our internal controls over financial reporting, resulting in a reasonable possibility that a material misstatement to the annual or interim financial statements would not have been prevented or detected.*** Accordingly, a material weakness increases the risk that the financial information we report contains material errors. Any system of internal controls, however well designed and operated, is based in part on certain assumptions and can provide only reasonable, not absolute, assurances that the objectives of the system are met. Efforts to correct any material weaknesses or deficiencies

that may be identified could require significant financial resources to address. Moreover, if remedial measures are insufficient to address the deficiencies that are determined to exist, we may fail to meet our future reporting obligations on a timely basis, our consolidated financial statements could contain material misstatements, we could be required to restate our prior period financial results, our operating results may be harmed, and we could become subject to class action litigation or investigations or proceedings from regulatory authorities. Internal control deficiencies and ineffective disclosure controls and procedures could also cause investors to lose confidence in our reported financial information. Any of these matters could adversely affect our business, reputation, revenues, results of operations, financial condition and stock price.

221. The Proxy presented "eligible lives" as a key business metric for the Company:

**Key Business Metrics**

We monitor the following key metrics to help us evaluate our business, identify trends affecting our business, formulate business plans and make strategic decisions. We believe the following metrics are useful in evaluating our business:

| (in thousands except number of health plan and enterprise clients) | Three months ended March 31, | | Year ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2020 | 2019 |
| Number of B2C active members at period end | 35.3 | 21.9 | 29.5 | 19.8 |
| Number of B2B eligible lives at period end | 41,820.7 | 9,569.0 | 39,444.4 | 7,607.1 |
| Number of health plan clients at period end | 10.0 | 9.0 | 10.0 | 9.0 |
| Number of enterprise clients at period end | 91.0 | 25.0 | 72.0 | 24.0 |
| Total number of active members at period end | 60.3 | 28.6 | 50.0 | 24.5 |
| Total number of members treated on Talkspace platform during period | 64.9 | 39.1 | 197.3 | 92.0 |

*Active Members:* We consider members "active" (i) in the case of our B2C members, commencing on the date such member initiates contact with a provider on our platform until the term of their monthly, quarterly or bi-annual subscription plan expires, unless terminated early, and (ii) in the case of our B2B members, if such members have engaged on our platform during the preceding 25 days, such as sending a text, video or audio message to, or participating in a video call with, a provider, completing a satisfaction or progress report survey or signing up for our platform.

*B2B Eligible Lives:* We consider B2B lives "eligible" if such persons are eligible to receive treatment on the Talkspace platform, in the case of our enterprise clients, for free when their employer is under an active contract with Talkspace, or, in the case of health plan clients, at an agreed upon reimbursement rate through insurance under an employee assistance program or other network behavioral health paid benefit program.

222. Regarding the number of "eligible lives" Talkspace covered, the Proxy stated as follows:

As of March 31, 2021, we had over 60,000 active members receiving care through our B2C and B2B channels, including approximately 35,000 B2C active members, and nearly 42 million B2B eligible lives. As of May 1, 2021, our B2B eligible lives grew to over 55 million. We consider members "active" (i) in the case of our B2C members, commencing on the date such member initiates contact with a provider on our platform until the term of their monthly, quarterly or bi-annual subscription plan expires, unless terminated early, and (ii) in the case of our B2B members, if such members have engaged on our platform during the preceding 25

days, such as sending a text, video or audio message to, or participating in a video call with, a provider, completing a satisfaction or progress report survey or signing up for our platform. ***We consider B2B lives "eligible" if such persons are eligible to receive treatment on the Talkspace platform, in the case of our enterprise clients, for free when their employer is under an active contract with Talkspace, or, in the case of health plan clients, at an agreed upon reimbursement rate through insurance under an employee assistance program or other network behavioral health paid benefit program.*** For the years ended December 31, 2019 and 2020, approximately 66% and 62% of our B2C members, respectively, and for the three months ended March 31, 2020 and 2021, approximately 60% and 58% of our B2C members, respectively, remained active on our platform beyond the initial term of their subscription.

223.    Moreover, the Proxy explained that expanding B2B 'eligible lives' was part of the

Company's growth strategy:

> **Growth opportunities: . . .** *Expand clients and B2B offering.* We expect to meaningfully expand our B2B channel through both the addition of new employer and health plan clients, as well as a focus on driving deeper penetration rates within our existing clients. We have a demonstrated track record of executing our "land-and-expand" strategy with enterprise clients, significantly expanding our B2B eligible lives in-client within the first year of contract. We plan to add new B2B clients by contracting with additional regional and national health plans, accelerating our outbound marketing efforts, leveraging our broker and consultant relationships and continuing to penetrate the massively underserved college and university market. Additionally, we are focused on further developing our dedicated internal B2B sales team solely focused on expanding our B2B client base as well as driving penetration within existing contracts–an effort we expect to drive significant traction within the near-term. Within our existing enterprise base, we plan drive penetration and engagement with an invested focus on client success. Additionally, because of our embedded position serving the B2B customer base, we believe we are well-positioned to innovate and lay the groundwork for additional services that drive value for their members such as navigation across the everchanging behavioral health landscape. We believe access to this service will continue to grow in importance as a larger patient population is unveiled through our increased access and focus on destigmatization of behavioral health treatment. ***Our B2B eligible lives was nearly 42 million as of March 31, 2021, up from approximately two million eligible lives in March 31, 2019.***

224. The Proxy further stated regarding growth projections of Talkspace's "eligible lives" metric: "HEC and Talkspace additionally forecasted that the number of total business to business eligible lives will increase from 6,725,000 in 2019, to 39,285,000 in 2020, 65,341,000 in 2021, 129,093,000 in 2022 and 174,218,000 in 2023."

225. In conjunction, the Proxy stated:

> Talkspace's growth projections with respect to B2B eligible lives are based on its management's assessment of potential, active opportunities with health insurance companies and other enterprises to project the number of potential B2B eligible lives. For the years ended December 31, 2019 and 2020, Talkspace's B2B eligible lives were approximately 7.7 million and 39.4 million, respectively. Talkspace's projections assume that Talkspace's behavioral health services will become an in-network eligible service to significantly all the lives managed by their existing health insurance clients in addition to new commercial relationships created with health insurance companies that Talkspace does not currently serve. Talkspace believes there is an increasing demand from commercial enterprises, state and local governments and higher education entities for improved access to Talkspace's behavioral health services that will provide Talkspace with the opportunity to significantly increase its revenue generating activities.

226. Regarding activity on the platform, Talkspace disclosed the following metrics:

> As of March 31, 2021, we had over 65,000 active members receiving care through our B2C and B2B channels, including approximately 35,000 B2C active members, and **nearly 42 million B2B eligible lives**. *As of May 1, 2021, our B2B eligible lives grew to over 55 million.* We consider members "active" (i) in the case of our B2C members, commencing on the date such member initiates contact with a provider on our platform until the term of their monthly, quarterly or bi-annual subscription plan expires, unless terminated early, and (ii) in the case of our B2B members, if such members have engaged on our platform during the preceding 25 days, such as sending a text, video or audio message to, or participating in a video call with, a provider, completing a satisfaction or progress report survey or signing up for our platform. *We consider B2B lives "eligible" if such persons are eligible to receive treatment on the Talkspace platform, in the case of our enterprise clients, for free when their employer is under an active contract with Talkspace, or, in the case of health plan clients, at an agreed upon reimbursement rate through insurance under an*

*employee assistance program or other network behavioral health paid benefit program.* For the years ended December 31, 2019 and 2020, approximately 66% and 62% of our B2C members, respectively, and for the three months ended March 31, 2020 and 2021, approximately 60% and 58% of our B2C members, respectively, remained active on our platform beyond the initial term of their subscription.

227. The Proxy further explained that Talkspace was "increasingly chosen as a preferred vendor," and provided another count of eligible lives:

In addition, we are increasingly chosen as a preferred vendor for higher education and government clients. Through our contracts with colleges, universities and Greek letter organizations, we provide mental health solutions to students and student athletes across the United States. We additionally hold a number of employer benefits and EAP relationships with municipalities and government agencies across the United States. As of February 28, 2021, *we had over 40 million eligible lives within our B2B channel*.

228. However, the statements in ¶¶ 220-27 were materially false and misleading when made because Talkspace did not disclose that its 'eligible lives' metrics involved double counting; in other words, if a user was covered by multiple health plans, he would be counted multiple times as an 'eligible life.' Similarly, the statement in ¶ 220 was false and misleading because, at the time it was made, Talkspace had material weaknesses in its internal controls over financial reporting, as well as its claims processing systems.

229. The Proxy explained that under Talkspace's management service agreements, the Company would "perform billing, scheduling and other non-clinical services." In other words, Talkspace was contractually bound to provide "maintenance of medical, billing and accounting records, legal, human resources and the administration of quality assurance, and administration of a risk management program."

230. The Proxy also contained the following statement regarding the minimal administrative burden on providers:

61

While optimizing consumers' access to care, **we believe our platform also provides benefits to providers through expanded reach, steady access to member leads, reduced administrative burdens**, more efficient time utilization and data-driven insights. These features, together with continuous training and professional growth opportunities we offer, empower providers to deliver what we believe will enable an enhanced care journey, higher member lifetime engagement, meaningful outcomes and greater margins when compared to face-to-face treatment.

231. Regarding HIPAA regulation of billing and collection of healthcare claims, the

Proxy stated, in relevant part, as follows:

HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, **including activities associated with the billing and collection of healthcare claims**. Additionally, HIPAA imposes mandatory penalties for certain violations. Penalties for such violations of HIPAA and its implementing regulations include civil monetary penalties of up to $59,522 per violation, not to exceed approximately $1.8 million for violations of the same standard in a single calendar year (as of 2020, and subject to periodic adjustments for inflation). However, a single breach incident can result in violations of multiple standards, which could result in significant fines. A person who knowingly obtains or discloses individually identifiable health information in violation of HIPAA may face a criminal penalty of up to $50,000 and up to one-year of imprisonment. The criminal penalties increase if the wrongful conduct involves false pretenses or the intent to sell, transfer, or use identifiable health information for commercial advantage, personal gain, or malicious harm. HIPAA also authorizes state attorneys general to file suit on behalf of their residents. While HIPAA does not create a private right of action allowing individuals to sue us in civil court for violations of HIPAA, its standards have been used as the basis for duty of care in state civil suits such as those for negligence or recklessness in the misuse or breach of PHI. Any such penalties or lawsuits could harm our business, financial condition, results of operations and prospects. In addition, HIPAA mandates that the Secretary of the U.S. Department of Health and Human Services ("HHS") conduct periodic compliance audits of HIPAA covered entities or business associates for compliance with the HIPAA Privacy and Security Standards. It also tasks HHS with establishing a methodology whereby harmed individuals who were the victims of breaches of unsecured PHI may receive a percentage of the Civil Monetary Penalty fine paid by the violator.

232.    The statements in ¶¶ 229-31 above were materially false and misleading when made because despite claiming that the Company would provide "reduced administrative burdens and explaining its regulatory obligations, Talkspace had inadequate structures to timely process health care claims, and consequently, the Company had overvalued its accounts receivables from certain of its Health Plan Clients in its B2B business, which amounts required adjustment downward.

233.    Moreover, another "Risk Factor" in the Proxy warned that although HEIC conducted due diligence, Talkspace could still be subject to write-downs and other charges:

> Following the Closing, Talkspace, Inc. may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on Talkspace, Inc.'s financial condition, results of operations and its stock price, which could cause you to lose some or all of your investment.
>
> ***Although HEC has conducted due diligence on the Talkspace business, HEC cannot assure you that this diligence will surface all material issues that may be present in such business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of the Talkspace business and outside of HEC's and Talkspace's control will not later arise.  As a result of these factors, Talkspace, Inc. may be forced to later write-down or write-off assets, restructure operations, or incur impairment or other charges that could result in losses.  Even if HEC's due diligence successfully identifies certain risks, unexpected risks may arise, and previously known risks may materialize in a manner not consistent with HEC's preliminary risk analysis.  If any of these risks materialize, this could have a material adverse effect on Talkspace, Inc.'s financial condition and results of operations and could contribute to negative market perceptions about our securities or Talkspace, Inc.***

234.    Additionally, the Proxy included unaudited pro forma condensed financial information.  Included within that information, the Proxy listed, as an asset for Talkspace, accounts receivable of $7,580,000 as of March 31, 2021.

235.    The foregoing statements in ¶¶ 233-34 were materially false and misleading when

made because it failed to disclose that Talkspace already had a heightened risk of write-downs, because the Company was manually processing health insurance claims, thus presenting an acute risk that those claims would not be paid by the insurers, as described herein.

236.    Furthermore, with respect to the Proxy, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303") required Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105(a) ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

237.    The failure of the Proxy to disclose the fact that Talkspace was suffering heightened online advertising and customer acquisition costs, lower conversion rates, and more tepid demand in its B2C business and worsening growth and gross margin trends violated Item 303, because these undisclosed facts were known to Defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.  These failures also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in Talkspace securities speculative or risky.

## VIII.   LOSS CAUSATION

238.    On August 9, 2021, after the market closed, Talkspace issued a press release announcing the Company's financial results for the second quarter of 2021.  That same day, also after market close, Talkspace held a conference call to discuss the results.  The conference call partially, but not fully, revealed the truth concealed by Defendants' misrepresentations.  As an

example, Defendants revealed issues relating to increased customer acquisition costs due to rising digital advertising costs as well as confirming a material increase in customer acquisition costs. The concealed risk that Talkspace had in fact incurred increased customer acquisitions costs partially materialized when Talkspace revealed the negative financial results.

239.    Talkspace reiterated on the August 10, 2021 call that B2B had reached 56 million eligible lives by the end of the second quarter of 2021, without qualifying the fact that it had been double-counting lives, and reaffirmed its guidance.  Defendant Frank reiterated on the earnings conference call that day that Talkspace was "we are on track to meet our revenue guidance of $125 million growing our revenue by 64% for the fiscal year of 2021."  Defendant Frank acknowledged that Talkspace and its peers were "experiencing elevated customer acquisition costs due mainly to a material increase in the cost of digital advertising," but failed to explain that Talkspace was also suffering from a lack of emphasis on the B2B funnel in favor of the B2C business, which had higher acquisition costs, and that its user retention and conversion were also suffering.

240.    On this news, Talkspace's stock price fell 18.72% or $1.11 per share, to close at $4.82 per share on August 10, 2021, as compared to $5.93 per share on August 9, 2021.  Talkspace stock remained artificially inflated.

241.    On November 15, 2021, Talkspace shocked the market, announcing in a press release filed on a Form 8-K quarterly sales of $26.36 million, missing analyst consensus by nearly 20%.  The Company revealed that it was forced to increase the allowance for credit losses by $3.4 million, and to withdraw its year-end guidance, and the long-term guidance the Company provided investors in January 2021, "given current business conditions," according to Fulk.

242.    Talkspace stock reacted to the news.  On November 16, 2021, Talkspace stock fell 36.28%, or $1.23 per share, from a close of $3.39 on November 15, 2021, to a close of $2.16 on

November 16, 2021, on volume of over 19.5 million shares—nearly twenty times the average for the prior ninety trading days.  Talkspace stock remained artificially inflated.

243.    Following the "difficult" quarter and management shakeup, analysts at Citi downgraded Talkspace stock, and, notably, lowered their price target significantly, indicating that the information Talkspace disclosed was a surprise.  Analysts  at SVB Leerink also downgraded Talkspace stock.

244.    Baird analyst Vikram Kesavabhotla slashed the price target for Talkspace and cut the recommendation.  The analyst commented that the quarter was "disappointing," which "almost did not matter in comparison to the broader dynamics—including management turnover and pulling FY/long-term guidance.  We underappreciated how quickly execution challenges and the macro/competitive environment could impact TALK."

245.    On November 22, 2021, before the market opened, Talkspace announced that President and COO Mark Hirschhorn was resigning "effective immediately."  Talkspace stock reacted by falling 7.14%, or $0.16 per share, from a close of $2.24 on November 19, 2021 to a close of $2.08 on November 22, 2021, on volume of nearly 3 million shares, well above the average for the prior ninety trading days.

246.    Trade media drew an immediate connection between this resignation and the disclosure less than a week before.  For example, MedCityNews noted that "just days after both of the company's co-founders departed, Talkspace COO Mark Hirschhorn is also resigning, effective immediately."[4]  The same report continued that "with its founders gone, and after two disappointing earnings reports, the company's future is coming into question . . . ."  *Id.*  Behavioral Health Business observed:

---

[4] Elise Reuter, *After internal review, another Talkspace exec resigns*, MEDCITYNEWS (Nov. 23,  2021), https://medcitynews.com/2021/11/after-internal-review-another-talkspace-exec-resigns/.

> Both resignations come in the wake of poor performance on the part of Talkspace.  A week ago, the company announced that, in the third quarter of the year, it failed to grow its business-to-consumer segment sufficiently, struggled with collecting on insurance claims and saw losses grow as marketing costs ballooned while revenue lagged. [5]

247.   Analysts at Citi observed that the resignation "will make it more difficult to fix the problems" revealed on November 15, 2021.

## IX.    PRESUMPTION OF RELIANCE

248.   Plaintiffs intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (i) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (ii) the omissions and misrepresentations were material; (iii) HEIC/Talkspace's common stock traded in an efficient market; (iv) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Talkspace common stock; and (v) Plaintiffs purchased Talkspace common stock between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

249.   The market for Talkspace common stock was open, well-developed, and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements, Talkspace's common stock traded at artificially inflated prices during the relevant period.  The artificial inflation continued until the time the market fully came to realize the nature and extent of Defendants' misrepresentations concerning (i) HEIC's overstatement of its competitive advantage and due diligence capabilities with respect to identifying and effectuating a merger with target companies, and its inadequate due diligence into then-private Legacy Talkspace, or else that it ignored and/or failed to disclose multiple red flags concerning then-private, pre-Merger

---

[5] Chris Larson, *Talkspace COO Out Following 'Internal Review' of Conduct*, BEHAVIORAL HEALTH BUSINESS (Nov. 22, 2021), https://bhbusiness.com/2021/11/22/talkspace-coo-out-following-internal-review-of-conduct/.

Talkspace's business and operations; (ii) issues with Talkspace's matching algorithm; (iii) Talkspace's significantly increased online advertising costs in the B2C business, as well as lower conversion rates from its online advertising in its B2C business; (iv) more tepid B2C demand, leading to ballooning customer acquisition costs and worsening growth and gross margin trends; (v) Talkspace's inadequate structures to timely process health care claims, and consequently, its overvaluation of its accounts receivables, which amounts required adjustment downward; (vi) the number of "eligible lives" Talkspace covered; (vii) the lack of confidence in its current management team; (viii) the material weaknesses in its internal controls over financial reporting, as well as its claims processing systems; and (ix) that as a result of the foregoing, Talkspace's 2021 financial guidance was not achievable and lacked any reasonable basis in fact.

250.    At all relevant times, the market for HEIC/Talkspace's common stock was efficient for the following reasons, among others: (a) Talkspace filed periodic reports with the SEC; (b) Talkspace's common stock met the requirements for listing and was in fact listed and actively traded on the NASDAQ, a highly efficient and automated market, during the time that Plaintiffs purchased Talkspace's common stock; (c) numerous securities analysts that were employed by major brokerage firms followed Talkspace, preparing reports that were distributed to the sales forces and customers of their respective brokerage firms, with such reports being publicly available and entering the public marketplace; and (d) HEIC/Talkspace regularly publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

251.    Plaintiffs relied on the market price of HEIC/Talkspace's common stock, which

reflected all the information in the market, including the misstatements by Defendants.

## X.    NO SAFE HARBOR

252.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Talkspace who knew that those statements were false when made.

## XI.    CLASS ACTION ALLEGATIONS

253.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of: (i) all persons or entities that purchased or otherwise acquired Talkspace securities between June 11, 2020 and November 15, 2021, both dates inclusive; and (ii) all holders of Talkspace common stock as of the Record Date for the special meeting of shareholders held on June 17, 2021 to consider approval of the Merger and who were entitled to vote on the approval of the Merger.  Excluded from the Class are Defendants and members of their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, the legal representatives, heirs,

successors, or assigns of any of the foregoing, and any entity in which Defendants have or had a controlling interest.

254.    The members of the Class are so numerous that joinder of all members is impracticable.  As of the close of business on the Record Date, there were 51.75 million outstanding shares of HEIC's common stock.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Talkspace or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

255.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

256.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

257.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants as alleged herein;

(b)    whether statements made in the Proxy misrepresented material facts about the business, operations, and prospects of Talkspace; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

258.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    FRAUD CLAIMS

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

259.    Co-Lead Plaintiffs incorporate by reference and reallege each and every allegation contained above (other than disclaimers of fraud claims) as if fully set forth herein.

260.    During the Class Period, Defendants each carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Co-Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Talkspace securities at artificially inflated prices.

261.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Talkspace's securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

262.    During the Class Period, the Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

263.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. The Defendants engaged in this misconduct to conceal Talkspace's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

264.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operation, and prospects.

265.     Co-Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Talkspace securities.  Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Talkspace's securities had been artificially inflated by the Defendants' fraudulent course of conduct.

266.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered economic loss and damages in connection with their respective purchases of the Company's securities during the Class Period as the prior artificial inflation in the price of Talkspace's securities was removed over time.

267.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants, HEC, and the HEC Sponsor**

268.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

269.    Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act or any of the rules promulgated thereunder. Such "controlling persons" are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. §78t.

270.    The Individual Defendants acted as controlling persons of Talkspace within the meaning of Section 20(a) of the Exchange Act. By reason of their positions as officers and directors of Talkspace, and their ownership of Talkspace securities, the Individual Defendants had the power and authority to, and did, influence and control the decision making of the Company, including the content and dissemination of the various statements Lead Plaintiffs contend were false and misleading herein. The Individual Defendants were able to, and did, control the content of submissions to the SEC, and had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading before and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

271.    Likewise, HEC and the HEC Sponsor, as the private equity sponsor of the IPO and the Merger, and due to their influence and control over the Board, ownership of HEIC shares and relationships with HEIC's management, exercised general control over the operations of the Company and its business affairs. HEC and the HEC Sponsor, either directly or indirectly through

their affiliates, established HEIC, selected HEIC's management and the members of the Board, granted themselves substantial benefits in the IPO and the Merger, participated in the identification of target companies to be acquired by HEIC, evaluated Talkspace, and influenced and controlled the drafting of the Proxy, which Plaintiffs contend was false and misleading.

272.   The Individual Defendants, HEC, and the HEC Sponsor culpably participated in the 10(b) violations committed by all Defendants.

273.   By reason of such conduct, and their violations of Section 10(b) as described above, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

274.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Talkspace common stock during the Class Period.

## XIII.   PROXY CLAIMS

275.   Plaintiffs' Proxy Claims do not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme, or intentional conduct as part of their Proxy Claims. Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the following allegations for the purposes of Plaintiffs' claims under the Proxy Claim, which do not have scienter, fraudulent intent or motive as required elements.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiffs or members of the Class.

276.   As alleged herein at ¶¶ 202-37, Talkspace and the Proxy Defendants made a series of materially untrue statements and omissions of material facts in Talkspace's Proxy.  Those statements were misleading for the reasons stated in ¶¶ 207, 213-16, 219, 228, 232, 235.  Each of the Proxy Defendants participated in the preparation, review and dissemination of the materially

misleading Proxy complained of herein. The Proxy Defendants abdicated their duty to file and distribute to Plaintiffs and the Class a Proxy that was not misleading. Accordingly, the Proxy Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

277.    As a direct result of the Proxy Defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy, Plaintiffs and the Class were precluded from exercising their right to seek redemption of their shares prior to the Merger on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the Merger. The false and misleading Proxy used to obtain shareholder approval of the acquisition deprived Plaintiffs and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their HEIC shares. At all times relevant to the dissemination of the materially false and/or misleading Proxy, the Proxy Defendants were aware of and/or had access to the true facts concerning the true value of Talkspace, which was far below the assets that shareholders received. Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy that the Proxy Defendants used to obtain shareholder approval of and thereby consummate the Business Combination, Plaintiffs and the Class have suffered damage and actual economic losses in an amount to be determined at trial.

278.    The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

279.    The Proxy's untrue statements of material fact included, among other things, that: (i) HEIC had overstated its competitive advantage and due diligence capabilities with respect to

identifying and effectuating a merger with target companies, and HEIC had conducted inadequate due diligence into then-private Legacy Talkspace, or else ignored and/or failed to disclose multiple red flags concerning then-private, pre-Merger Talkspace's business and operations; (ii) Talkspace touted its proprietary matching algorithm, but users had issues matching with providers or would not use the algorithm at all; (iii) in part due to these matching issues, Talkspace was experiencing significantly increased online advertising costs in the B2C business since the beginning of 2021, as well as lower conversion rates from its online advertising in its B2C business; (iv) as a result, Talkspace was experiencing more tepid B2C demand than represented to investors, leading to ballooning customer acquisition costs and worsening growth and gross margin trends; (v) despite claiming that its technology platform was scalable, Talkspace had inadequate structures to timely process health care claims, and consequently, Talkspace had overvalued its accounts receivables from certain of its Health Plan Clients, which amounts required adjustment downward; (vi) Talkspace was double-counting people covered under multiple plans under one of its key business metrics; (vii) Talkspace did not have confidence in its current management team and was discussing management succession plans; (viii) Talkspace had material weaknesses in its internal controls over financial reporting, as well as its claims processing systems; and (ix) as a result of the foregoing, Talkspace's business was not as represented and its 2021 financial guidance was not achievable and lacked any reasonable basis in fact.

280.    The extent of Talkspace's problems was revealed in a series of disclosures as alleged above, on August 9, 2021 and on November 15, 2021.  In total, the disclosures caused the price of Talkspace's securities to fall by 7.14% from the date of the shareholder vote on the Merger.

## COUNT III
### For Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder
### <u>Against All Defendants</u>

281.    Plaintiffs incorporate by reference and reallege ¶¶ 1-147, 202-58 as though fully set forth herein.  This Count does not sound in fraud.  Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

282.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

283.    Defendants prepared and disseminated the false and misleading Proxy specified above, which misrepresented and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

284.    By virtue of their positions within HEIC, the HEC Sponsor, and Talkspace and their due diligence regarding the Merger, defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was prepared, reviewed, and/or disseminated by the defendants named herein.  The Proxy misrepresented and/or omitted material facts, as detailed above.  Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

285.    As stated herein, the Proxy contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The Proxy was an essential link in the consummation of the Merger.  The defendants also failed to correct the Proxy prior to the Merger, and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

286.    As a direct result of the defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy, Plaintiffs and the Class were precluded from exercising their right to seek redemption of their HEIC shares prior to the Merger on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the Merger.  The false and misleading Proxy used to obtain shareholder approval of the Merger deprived Plaintiffs and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their HEIC shares.  At all times relevant to the dissemination of the materially false and/or misleading Proxy, Defendants were aware of and/or had access to the true facts concerning the true value of Talkspace, which was far below the value as represented in the Proxy that shareholders were to receive.  Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy defendants used to obtain shareholder approval of and thereby consummate the Merger, Plaintiffs and the Class have suffered damage and actual economic losses in an amount to be determined at trial.

287.    The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other

information reasonably available to stockholders.

288.    Defendant Braunstein signed the cover letters for the Proxy, and otherwise permitted the use of his name in the Proxy.

289.    The Proxy was solicited "on behalf of the Board of Directors," and issued "by order of the Board of Directors."  Moreover, the Proxy Defendants permitted the use of their names by, among other things, allowing the Proxy Statement to represent that they recommended the Merger.

290.    The HEC Board unanimously recommended that HEC stockholders vote in favor of the proposed Merger.

291.    By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

**COUNT IV**
**For Violations of Section 20(a) of the Exchange Act**
**<u>Against the Proxy Defendants</u>**

292.    Plaintiffs repeat and reallege the allegations in ¶¶ 1-147, 202-58 as if set forth fully herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely in negligence.

293.    As alleged above, the Proxy Defendants violated Section 14(a) of the Exchange Act by their acts and omissions as alleged in this Complaint.

294.    Each of the Proxy Defendants acted as controlling persons within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).  By virtue of their ownership interest, high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, control over material operational data and/or intimate knowledge of the Company's actual performance, and their power to control the Proxy,

the Proxy Defendants had the power and ability to control the information contained in the Proxy. Indeed, the Proxy Defendants provided the operational information contained in the Proxy and were unjustly enriched from the Merger.  By reason of such conduct, the Proxy Defendants are liable pursuant to Section 20(a) of the Exchange Act.

295.    Specifically, the Proxy Defendants, by virtue of their high-level positions as officers and/or directors of HEIC and/or Talkspace, as detailed herein, participated in the operation and management of HEIC and/or Talkspace, and conducted and participated, directly and indirectly, in the conduct of the business affairs HEIC and/or Talkspace, and therefore exercised general control over the operations of HEIC and/or Talkspace.  The Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of HEIC and/or Talkspace, including the identification of target companies to be acquired by HEIC, the evaluation of Talkspace, and the content and dissemination of the Proxy, which Plaintiffs contend was false and misleading.

296.    Likewise, HEC and the HEC Sponsor, as the private equity sponsor of the IPO and the Merger, and due to their influence and control over the Board, ownership of HEIC shares and relationships with HEIC's management, exercised general control over the operations of the Company and its business affairs.  HEC and the HEC Sponsor, either directly or indirectly through their affiliates, established HEIC, selected HEIC's management and the members of the Board, granted themselves substantial benefits in the IPO and the Merger, participated in the identification of target companies to be acquired by HEIC, evaluated Talkspace, and influenced and controlled the drafting of the Proxy, which Plaintiffs contend was false and misleading.

297.    Plaintiffs and Class members eligible to vote on the Merger were denied the opportunity to make an informed decision in voting on the Merger and were damaged as a direct

and proximate result of the untrue statements and omissions in the Proxy and other solicitations described herein.

298.    This claim is brought within the applicable statute of limitations.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiffs and other members of the Class damages together with prejudgment and postjudgment interest thereon;

C.    Awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D.    Awarding Plaintiffs and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

## XV.    JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  August 1, 2022          **ROLNICK KRAMER SADIGHI LLP**

_/s/ Lawrence M. Rolnick_
Lawrence M. Rolnick
Marc B. Kramer
Matthew Peller
Anna Menkova
1251 Avenue of the Americas
New York, New York 10020
(212) 597-2800

81

**ROBBINS GELLER RUDMAN & DOWD LLP**
Samuel H. Rudman
David A. Rosenfeld
Evan J. Kaufman
58 South Service Road, Suite 200
Melville, New York 11747
(631) 367-7100

*Counsel for Lead Plaintiffs*